892 P.2d 1375

**Domenico ALAFACE (Deceased) and Beatrice Alaface, husband and wife, Angelo Alaface, as Personal Representative of the Estate of Domenico Alaface, Plaintiffs–Appellants, Cross Appellees,**

**v.**

**NATIONAL INVESTMENT COMPANY, an Arizona corporation, Defendant–Appellee, Cross Appellant.**

**No. 1 CA–CV 91–0210.**

Court of Appeals of Arizona, Division 1, Department A.

Sept. 1, 1994.

Review and Cross–Petition for Review Denied April 25, 1995.

588

Law Offices of David L. Lange by David L. Lange, Prescott, for plaintiffs-appellants cross appellees.

Favour, Weaver, Moore, Wilhelmsen & Schuyler, P.A. by John B. Schuyler, Jr., John M. Favour, Mark M. Moore, Prescott, for defendant-appellee cross appellant.

## OPINION

GRANT, Presiding Judge.

This appeal concerns an action to recover damages that allegedly resulted from misrepresentations made in the sale of a subdivision lot. We hold that (1) appellants' consumer fraud claim is barred by the statute of limitations; (2) the Arizona subdivision reporting statutes apply to appellee, but appellants' remedy under the statutes is limited to rescission; (3) appellee is not liable for the alleged misrepresentations by appellants' agent but it may be liable under a negligent misrepresentation by omission and negligence *per se* theory; (4) appellants and appellee did not have a fiduciary relationship; (5) appellee is not liable under common law fraud; (6) appellee is not entitled to an award of attorneys' fees under the purchase contract.

## I. FACTS AND PROCEDURAL HISTORY

In early May 1985, appellants Domenico and Beatrice Alaface ("the Alafaces") contacted Barbara Martin, a sales agent for Prescott Hills Realty and MG Construction Company, in response to an advertisement she had placed regarding lots for sale in the Diamond Valley subdivision in Prescott.[1] The Alafaces were interested in buying a lot on which they could build a house. They received a form letter from Martin regarding cabins to be constructed. The letter represented that water service was available to all of the Diamond Valley lots that Martin had for sale.

When the Alafaces met with Martin, she told them that anyone who bought a lot in Diamond Valley had to contract with MG Construction to build a house on the lot. The broker and owner of Prescott Hills Real-

1. Diamond Valley Unit 4 consisting of approximately eighty acres was subdivided by American Title and Trust Company, Trustee, on November 9, 1964, by the recordation of the subdivision plat which had been approved by the Yavapai County Board of Supervisors on November 2, 1964.

ty, Michael G. Thowson, was also the owner of MG Construction Company. While meeting with the Alafaces, Martin confirmed the representation that water service was available to Diamond Valley lots through a water company.

Because the Alafaces wanted a flat lot, they did not like any of the lots Martin had for sale. In talking with Thomas J. McGilvra, who was also a sales agent with Prescott Hills Realty, Martin learned that National Investment Company ("NIC") owned a lot in Diamond Valley (lot 657) that might meet the Alafaces' requirements and that NIC might be interested in selling the lot. McGilvra and Martin looked at lot 657 together, and Martin then showed it to the Alafaces, who liked the lot. McGilvra then asked Joe Clark, the president of NIC, whether lot 657 was for sale. Clark told McGilvra NIC would sell the lot for $9,500 cash. NIC had acquired the lot through a tax sale and foreclosure.

On May 28, 1985, the Alafaces executed a real estate purchase contract prepared by Martin, offering to purchase lot 657 for $9,500. The Alafaces' offer was contingent upon a favorable "perc" test and "a cabin construction contract with MG Construction Co. within 10 days." The contract provided that 100 percent of the broker's commission would go to Prescott Hills Realty.

McGilvra called Clark and read him the terms of the Alafaces' offer to purchase lot 657 and explained the contingency that the buyers did not want to buy the lot unless they could get a construction contract. Clark accepted the offer and agreed to pay McGilvra a commission. NIC did not sign the purchase contract nor did NIC receive a copy of the contract, but both NIC and the Alafaces executed escrow instructions. Although these instructions contained no contingencies, the Alafaces signed a construction contract with MG Construction on July 8, 1985, gave written instructions to the title company to remove the contingencies from the May 28, 1985, contract, and instructed the title company to close the sale. The sale closed July 9, 1985.

In November 1985, when the Alafaces' cabin was substantially completed, their son,

Angelo Alaface, contacted Triangle Development Corporation ("Triangle"), the water company for the subdivision, to apply for water service to lot 657. He was told that water service was not available. The Alafaces later learned that in August 1984, the Arizona Department of Water Resources ("DWR") had concluded that Triangle did not have enough water to service its existing customers and that the situation could be worse in the future because of poor water production and Triangle's inability to drill more wells in the area. They also learned that on July 6, 1985, Triangle sent an alert to all water users in Diamond Valley that there was a severe water shortage in the subdivision. On July 9, 1985, the Prescott newspaper printed an article about the severe water shortage in Diamond Valley and the temporary emergency hookup to the Prescott water system, and the Arizona Department of Health Services ("DHS") ordered Triangle not to issue any new meters due to the seriously overextended water supply in Diamond Valley. The Alafaces did not receive water service to their lot until January or February of 1988.

In the meantime, on June 11, 1987, the Alafaces demanded by letter that NIC rescind the sale of lot 657 due to the misrepresentations concerning the availability of water. In addition to rescission, the Alafaces demanded that NIC pay them $75,900 to return them to the status quo. NIC refused to rescind the contract.

On October 8, 1987, the Alafaces filed a complaint against NIC, Thowson, Martin, McGilvra and the title company. The complaint alleged fraud and misrepresentation regarding Martin's statements that water was available to the lot and that the Alafaces must have MG Construction build the house in order to purchase lot 657. The complaint also alleged that NIC, Thowson, Martin and McGilvra intentionally failed to disclose that lot 657 did not have an adequate water supply and/or system. The complaint further alleged breach of fiduciary duty, consumer fraud, and violation of Ariz.Rev.Stat.Ann. ("A.R.S.") section 32-2181 et seq., which requires notices regarding subdivisions. The Alafaces sought rescission of the contract

and reimbursement for purchase of the lot, cabin construction, loss of use of property, loss of interest on monies, and travel expenses. They also sought damages, including punitive damages.

The Alafaces subsequently withdrew their claim for rescission and their RICO claim was dismissed. The case proceeded as a damages case only. In March 1989, the case was assigned to arbitration, and NIC filed a motion for summary judgment. NIC made the following arguments: (1) that the consumer fraud claim was barred by the statute of limitations, (2) NIC was not subject to any liability for civil remedies under A.R.S. section 32–2183.03 because it was not a "subdivider" as defined in the statutes, and (3) NIC made no misrepresentations to the Alafaces and did not breach any fiduciary duty.

The Alafaces responded and filed a cross-motion for summary judgment. They asserted that the consumer fraud action did not accrue until they discovered that they had been damaged, that NIC, as owner of four or more lots in Diamond Valley, was required to obtain a public subdivision report, and that NIC ratified the misrepresentations of the real estate salespersons and therefore was bound by and liable for them.

The arbitrator granted summary judgment in favor of the Alafaces and against NIC for violation of A.R.S. section 32–2181 *et seq.* and for negligent misrepresentation. Following an arbitration hearing, the arbitrator found in favor of the Alafaces against NIC, Martin and McGilvra and awarded the Alafaces $5,800 as damages and $1,768.46 in costs.

NIC filed a motion for judicial review of its motion for summary judgment and an appeal from the arbitration award. The Alafaces filed a motion for judicial review of their cross-motion for summary judgment.

Following oral argument, the trial court found that (1) with respect to the claims for common law fraud, negligent misrepresentation and breach of fiduciary duty, NIC made no representations either in person or through an authorized agent to the Alafaces nor was any relationship established between NIC and the Alafaces sufficient to create fiduciary responsibility; (2) the Alafaces'

claim for consumer fraud was barred by the statute of limitations because they failed to file their action within one year after discovery of their injury; and (3) the Alafaces had a claim against NIC pursuant to A.R.S. section 32–2183 *et seq.* but their remedy was limited to rescission and they had abandoned their claim for rescission. Accordingly, the court granted NIC's motion for summary judgment and denied the Alafaces' cross-motion.

NIC applied for attorneys' fees of $32,-496.50 and argued that it was entitled to a fee award under A.R.S. section 12–341.01 because the claims arose from the contract between NIC and the Alafaces and under A.R.S. section 12–349 because the claim was brought without substantial justification. In the judgment, the trial court awarded NIC its costs of $1,131.75 but did not award any attorneys' fees.

The Alafaces appealed from the judgment in favor of NIC. NIC cross-appealed from the denial of its application for an award of attorneys' fees.

## II. ISSUES

### APPEAL

1. Did the trial court err in dismissing the Alafaces' consumer fraud claim as barred by the statute of limitations?

2. Do the subdivision reporting statutes apply to NIC?

3. Did the trial court err in ruling that NIC was not liable for the misrepresentations of the real estate agents?

4. Did the trial court err in granting NIC's motion for summary judgment on the negligent misrepresentation by omission and negligence *per se* claim?

5. Did the trial court err in ruling that the Alafaces did not have viable breach of fiduciary duty or common law fraud claims?

6. Did the granting of summary judgment by the trial court deprive the Alafaces of their constitutional right to trial by jury?

## CROSS–APPEAL

7. Did the trial court improperly deny NIC's request for attorneys' fees?

## III. DISCUSSION

### A. Dismissal of Consumer Fraud Claim

The trial court dismissed the Alafaces' consumer fraud claim holding that it was not filed within a year after discovery of their injury. On appeal, the Alafaces argue that even though Triangle denied them water service in November 1985 and DHS denied their request for water service in July 1986, they did not discover until March 1987 that when Martin misrepresented the water situation she was or should have been aware of the water problems, and that NIC was required to obtain a commissioner's report on the subdivision prior to the sale. The Alafaces thus maintain that their filing of a complaint in October 1987 was within the one-year limitation period for consumer fraud claims.

■ A consumer fraud claim is created by statute. A.R.S. § 44–1521 *et seq.; Sellinger v. Freeway Mobile Home Sales, Inc.,* 110 Ariz. 573, 575–76, 521 P.2d 1119, 1121–22 (1974). As a liability created by statute, a consumer fraud action must be initiated within one year after the cause of action accrues. A.R.S. § 12–541(3); *Murry v. Western Am. Mortgage Co.,* 124 Ariz. 387, 390, 604 P.2d 651, 654 (App.1979).

■ Pursuant to the discovery rule, as adopted in Arizona, the statute of limitations for common law fraud begins running "when the defrauded party discovers or with reasonable diligence could have discovered the fraud." *Mister Donut of Am., Inc. v. Harris,* 150 Ariz. 321, 323, 723 P.2d 670, 672 (1986). We believe this standard is also applicable to an action for consumer fraud.

Ordinarily, when the cause of action accrues is a question for the finder of fact. *Id.* Summary judgment is appropriate when no genuine dispute exists as to any material fact, when only one reasonable inference can be drawn from the facts, and based upon the facts the moving party is entitled to judgment as a matter of law. *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000,

1008 (1990). In this case the undisputed facts are sufficient to warrant summary judgment.

■ The cause of action accrues when "the plaintiff knows or should have known of both the *what* and *who* elements of causation." *Lawhon v. L.B.J. Institutional Supply, Inc.,* 159 Ariz. 179, 183, 765 P.2d 1003, 1007 (App. 1988). The Alafaces' house in Diamond Valley was completed in November 1985, and they were unable to get water service at that time. In July 1986, DHS confirmed that water service was unavailable to them. Thus, at the latest in July 1986, the Alafaces had actual knowledge of the "what" element of causation—that they had been told there was water service available in Diamond Valley but after completion of their house they were unable to obtain water service and therefore could not live in the house.

The "who" element was also known to the Alafaces by July 1986. Even before they purchased the lot they knew that Martin had represented to them that water service was available to the lot. By the time the lot was in escrow, they had written documentation that NIC was the seller of the property. Therefore, by the time the Alafaces were damaged, they knew that the misrepresentation regarding availability of water had been made by Martin and that NIC had sold them the property.

A jury could reasonably conclude that the Alafaces knew or should have known prior to July 1986. However, it is undisputed that by July 1986 the Alafaces had actual knowledge of their consumer fraud claim. Thus, the Alafaces must fail in their argument that their consumer fraud claim did not accrue until they began to suspect in March 1987 that the misrepresentations were knowingly made. They did not have to know all of the underlying details of the misrepresentation before their cause of action accrued. Furthermore, the only showing of intent required in a consumer fraud claim is an intent to do the act involved; specific intent to deceive need not be shown. *State ex rel. Babbitt v. Goodyear Tire & Rubber Co.,* 128 Ariz. 483, 486, 626 P.2d 1115, 1118 (App. 1981). Thus, once the Alafaces knew that

Martin's representations were not true and that they had been damaged by reliance on the representations, the Alafaces' cause of action accrued. This was no later than July, 1986. Because they did not file the complaint until October 1987, the Alafaces' consumer fraud claim was barred by the one-year statute of limitations, and the trial court properly dismissed that claim.

### B. Violation of Subdivision Reporting Statutes

The Alafaces argue that regardless of whether Martin was NIC's agent, NIC made its own misrepresentations by failing to disclose information regarding the subdivision as required by law. NIC responds that it was not subject to the provisions of A.R.S. section 32–2181 *et seq.* when it sold the lot to the Alafaces.

We look to the relevant statutes to determine whether they apply to NIC. First, A.R.S. section 32–2181(A) (1990) provided that before offering subdivided lands for sale or lease, the owner, agent or subdivider must notify the state real estate commissioner in writing of the intention to do so. The notice must contain, among other things, a statement of provisions for public utilities, including water, and a "true statement" of the availability of public utilities, including water. A.R.S. § 32–2181(A)(8), (20) (1990). After examination of the subdivision, the commissioner issues a public report that authorizes the sale or lease of lots or parcels in the subdivision and contains the information obtained pursuant to section 32–2181. A.R.S. § 32–2183(A) (1990). The owner, agent or subdivider must then furnish each prospective buyer of a subdivision lot with a copy of the report. *Id.* Pursuant to A.R.S. section 32–2185.06 (1990),

> [a]ll agreements and contracts for the purchase or lease of subdivided land from a subdivider, owner or agent shall clearly and conspicuously disclose ... the nature of the document, the purchaser's right to receive a copy of the public report and, in the case of unimproved lots or parcels ... the purchaser's right to rescind the agreement. . . .

NIC argues that these provisions did not apply to it because the intent of the statutes on sale of subdivided lands is to impose restrictions on subdividers and agents of the subdividers, not on non-subdividers. NIC maintains that because Diamond Valley Unit 4 had been subdivided years before NIC acquired lot 657 and seven other lots in the subdivision, NIC could not have been subject to the subdivision reporting requirements. We disagree.

When interpreting statutes, we must attempt to ascertain and give effect to the intent of the legislature. *Hampton v. Glendale Union High School Dist.,* 172 Ariz. 431, 434, 837 P.2d 1166, 1169 (App.1992). The language of a statute is the most reliable indicator of legislative intent. *Bird v. State,* 170 Ariz. 20, 23, 821 P.2d 287, 290 (App.1991). We read the words of the statute as having their ordinary meanings. *Id.* In determining legislative intent, we may also consider the context of the statute and its historical background, subject matter, effects, consequences and purpose. *Hampton,* 172 Ariz. at 434, 837 P.2d at 1169.

The language of the statutes at issue when read together apply to NIC. Sections 32–2182(A), 32–2183(A) and 32–2185.06 apply to owners of subdivided lands as well as to the subdividers and their agents. Nothing in the definition of subdivided lands requires the lands to have been divided by the current owner. A.R.S. § 32–2101(41) (1992). NIC, as the successor in interest to lots within a subdivision, is an owner of subdivided lands.

This interpretation is bolstered by A.R.S. section 32–2181(B). This section provides that, upon application, the commissioner "may grant an owner, agent or subdivider of lots or parcels within a subdivision previously approved by the commissioner an exemption from all or part of the notification requirements" of section 32–2181(A). The clear intent of this language is that unless exempted by the commissioner, an owner of subdivision lots or parcels must comply with the notification requirements even if the subdivision was previously approved.

Additionally, the rules promulgated by the state real estate commissioner reflect a simi-

lar interpretation. Ariz.Admin.Code R4–28–1204 (1991) specifies reduced filing requirements for certain owners who are *successors in interest* to lots within a subdivision previously approved by the Commissioner. As a successor in interest to lots within a subdivision, NIC is subject to the notification requirements of the subdivision reporting statutes.

NIC argues that this result must not be the intention of the law because such a result would require every owner of a single lot situated in a subdivision to provide a property report upon sale—regardless of whether the sale is the initial sale from the subdivider or the fifteenth resale of the lot involving non-subdivider owners. We disagree. This argument ignores the effect of statutory sections that exempt certain sales, such as section 32–2181.02. Additionally, the legislature apparently recognized this concern and amended the statutes accordingly in 1993.[2] We need not decide whether the subdivision reporting statutes apply to the fifteenth owner of a single lot in a properly approved subdivision because that is not the position in which NIC stood. NIC was the owner of eight lots in a subdivision for which the commissioner had not issued a public report and on which a moratorium on new water hookups had been imposed.

■ Having determined that NIC was subject to the notification requirements, we nevertheless agree with the trial court's conclusion that the Alafaces' remedy under the statutory scheme was limited to rescission. Section 32–2183(D) provided:

No person shall sell or lease or offer for sale or lease in this state any lots or parcels in a subdivision without first obtaining a public report from the commissioner except as provided in § 32–2181.01, 32–2181.02 or 32–2181.03. Any sale or lease of subdivided lands prior to issuance of the public report shall be voidable by the purchaser. An action by the purchaser to void such transaction shall be brought within three years of the date of execution of the purchase agreement by the purchaser. In any such action, the prevailing party shall be entitled to reasonable attorneys' fees as determined by the court.

Thus, the Alafaces were entitled to bring an action to void or rescind their purchase of lot 657 from NIC.

■ The Alafaces argue that they are entitled to money damages for NIC's failure to comply with subdivision reporting requirements because another section entitled "Civil Liabilities," A.R.S. section 32–2183.03(H), provides that nothing contained in that section "shall be construed to preclude any other remedies that may exist at law or in equity." Section 32–2183.03, however, applies only to subdividers or agents; it does not refer to civil liabilities of owners. Because the other relevant subdivision reporting statutes refer to "owner, agent or subdivider" (*see, e.g.,* A.R.S. §§ 32–2181(A), (B), 32–2181.02 and 32–2183(A)) and section 32–2183.03 omits "owner," we presume the legislature intended the omission and thus did not intend for the provisions of section 32–2183.03 to apply to owners who are not also subdividers. *See Arizona Bd. of Regents v. State ex rel. Public Safety Retirement Fund*

2. Our interpretation is bolstered by the fact that A.R.S. §§ 32–2181(A) and (B) and 32–2181.02 have subsequently been amended to delete "owner" and refer only to "subdivider." Laws 1993, Ch. 140, § 21. But, under this same amendment, the definition of "subdivider" was changed to include certain "owners" who did not subdivide the lands.

At the time this action was heard in the trial court, the definition of "subdivider" was "any person who offers for sale or lease four or more lots in a subdivision *and* who causes land to be subdivided into a subdivision for himself or others, or who undertakes to develop a subdivision...." A.R.S. § 32–2101(40) (1990) (emphasis added). Although NIC offered for sale more than four lots in the subdivision, it had not caused the land to be subdivided into the subdivision; thus, NIC did not fall under the definition of a subdivider. This definition was amended by Laws 1993, Ch. 140, § 1, effective April 20, 1993, to read that a subdivider is "any person who offers for sale or lease four or more lots, parcels or fractional interests in a subdivision *or* who causes land to be subdivided into a subdivision...." A.R.S. § 32–2101(46) (Supp.1993) (emphasis added). Under this definition, NIC likely would be a subdivider. However, because we apply the statute in effect at the time of the occurrence of the events in this action, we consider NIC to be an owner, not a subdivider.

*Manager Adm'r,* 160 Ariz. 150, 157, 771 P.2d 880, 887 (App.1989) (where legislature specifically used a term in certain places within a statute and excluded it in another place, court will not read the term into the section from which it was excluded). Therefore, because NIC was not a subdivider, the Alafaces' statutory remedy was limited to rescission under section 32–2183(D). As the Alafaces had withdrawn their request for rescission, the trial court properly ruled that they were not entitled to damages under the subdivision reporting statutes.

## C. Common Law Liability

Although the Alafaces' only statutory remedy was rescission, nothing in the subdivision reporting statutes limits their right to recover under other common law theories.

### 1. *Misrepresentation By Agents*

■ The Alafaces argue that Martin/McGilvra/Prescott Hills Realty were the agents of NIC for the sale of lot 657 and thus that NIC is liable for the misrepresentations of Martin. The Alafaces further assert that even if NIC is not directly liable for the misrepresentations under agency principles, NIC became liable when it ratified its agents' misrepresentations by refusing to rescind the sale of the lot when the Alafaces offered to rescind.

NIC responds that no agency theory applies because neither Martin, McGilvra nor Prescott Hills was NIC's agent in the sale. We agree.

The situation before us is much like the one presented to the court in *Mead v. Hummel,* 58 Ariz. 462, 121 P.2d 423 (1942). There in *Mead,* real estate broker Perkins and his salesman Kelly, who represented Mead and Simpson, contacted Hummel and said they had buyers for land owned by Hummel. A price for the land was determined, and Hummel agreed to pay a commission if a sale was consummated. Sometime after Mead and Simpson purchased the property, a dispute arose with Hummel regarding a strip of land that Perkins and Kelly had represented to be the continuation of a road. In holding that Hummel was not responsible for the misrep-

resentations of Kelly and Perkins, the *Mead* court stated:

> There is no evidence that Perkins and/or Kelly were the agents of [Hummel] for the purpose of selling the property. On the contrary, it appears that [Hummel] never employed them but that they contacted [Mead and Simpson], and after showing them several pieces of property and finding that they preferred, if possible, to secure part of [Hummel's] land, they then, for the first time, approached [Hummel], telling him that they had buyers for part of the property if terms could be agreed upon. Under such circumstances there can be no doubt that Perkins and Kelly were the agents of [Mead and Simpson] rather than [Hummel] in making the sale. Nor does the fact that after he was approached [Hummel] said he would pay them a commission if the deal was consummated alter that fact.

58 Ariz. at 467–68, 121 P.2d at 425.

The courts in *Norville v. Palant,* 25 Ariz. App. 606, 545 P.2d 454 (1976), and *Brean v. North Campbell Professional Bldg.,* 26 Ariz. App. 381, 548 P.2d 1193 (1976), applied the law from *Mead* and reached the same result. The *Norville* court explained that, as in *Mead,* the realty broker was in contact with the buyer before it began its dealings with the seller through the broker's salesman. The *Norville* court concluded that the salesman was only the buyer's agent and that the seller's offer to pay the salesman a commission did not change the result. 25 Ariz.App. at 609, 545 P.2d at 457.

The court in *Brean* similarly noted that the realtor was not the seller's agent but rather the buyers' agent because the realtor first approached the buyers with the proposal to find a piece of property for them and then sought out the seller's land. The court concluded that the fact that the listing agreement contained the seller's promise to pay the commission upon the sale of the property did not make the realtor her agent. 26 Ariz.App. at 385, 548 P.2d at 1197.

The facts in these cases are virtually indistinguishable from the facts before us. In addition, the court in *Formento v. Encanto Business Park,* 154 Ariz. 495, 498, 744 P.2d

22, 25 (App.1987), indicated that a salesman for a real estate broker was not the agent of the sellers even though the broker was the listing agent for the property. In *Formento*, the salesman showed property to the buyer, presented the buyer's offers to the sellers, and was paid a commission as the buyer's agent. Therefore, because Martin and McGilvra—and thus their broker, Prescott Hills Realty—were looking for property for the Alafaces and contacted NIC on the Alafaces' behalf, they were agents of the Alafaces rather than NIC. Therefore, NIC is not liable for Martin's misrepresentations to the Alafaces.

The Alafaces argue that pursuant to *Light v. Chandler Improvement Co.*, 33 Ariz. 101, 261 P. 969 (1928), and *Jerger v. Rubin*, 106 Ariz. 114, 471 P.2d 726 (1970), NIC became liable for Martin's misrepresentations when it ratified her statements by refusing to rescind the transaction upon demand by the Alafaces. We disagree. In *Light* and *Jerger*, the false representations were made by the sellers' agents. *See also Bailey v. Kuida*, 69 Ariz. 357, 213 P.2d 895 (1950) (sellers who refused to rescind land sale were bound by misrepresentations of their agent). Here we have determined that Martin was not NIC's agent.

The courts in *Light, Jerger* and *Bailey* did not discuss whether an agent must be the agent of the seller before the ratification theory adopted in *Light* would apply. In those cases, there was no question that the agents were the agents of the sellers.

In determining the seller's liability for the misrepresentation of his agent, the *Light* court first adopted the rule that a real estate broker who is engaged to find a buyer for real property upon the terms set by his principal "cannot bind the principal by representations in regard to the quality and value of the land, unless he was expressly authorized to make such representations, or unless they are known to his principal before the sale is consummated." *Light*, 33 Ariz. at 107, 261 P. at 970. The court concluded, however, that an exception to this rule existed when a buyer defrauded by an agent advised the seller of the fraud and offered to rescind the sale, and the seller refused to rescind. In

that situation, the seller was deemed to have ratified the alleged representations of the agent, and the buyer could pursue against the seller any remedy he would have if the representation had been made by the seller himself. *Id.* at 108–09, 261 P. at 971.

Because ratification of the agent's misrepresentation is an exception to the rule of non-liability of the principal, this exception should be applied narrowly. Holding the seller responsible for his own agent's misrepresentation is a fair way to protect the innocent buyer who bought the property on the basis of the misrepresentation. *See Light*, 33 Ariz. at 108, 261 P. at 971. In addition, holding the seller responsible for the acts of an agent he has chosen is not unfair if the buyer advises the seller of the fraud and offers to return both parties to the status quo. However, to hold the seller responsible for misrepresentations made by the buyer's own agent, whom the seller did not choose, even under a rescission/ratification theory would not be just. Therefore, we conclude that *Light* and *Jerger* do not apply to impose liability on NIC for Martin's false statements.

### 2. *Negligent Misrepresentation by Omission and Negligence Per Se*

█ Included in their claim for negligent misrepresentation, the Alafaces argue that NIC is liable for its own misrepresentation by omission under a theory of negligence *per se* due to NIC's alleged violation of the subdivision reporting statutes. We conclude that this argument has merit.

Initially we point out that Arizona common law has, under some circumstances, imposed on a seller a duty to disclose. *E.g., Hill v. Jones*, 151 Ariz. 81, 725 P.2d 1115 (App.1986); *Frazier v. Southwest Sav. and Loan Ass'n*, 134 Ariz. 12, 653 P.2d 362 (App.1982).

A duty to speak ... will be imposed on a party to a business transaction "if he knows that the other is about to enter into it under a mistake as to [facts basic to the transaction], and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts". If a party has such

knowledge, then a duty will be imposed to exercise reasonable care to disclose such facts to the other party.

*Frazier*, 134 Ariz. at 17–18, 653 P.2d at 367–68 (quoting Restatement (Second) of Torts § 551 (1977)) (footnote omitted). This is especially true when "[d]isclosure would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if nondisclosure amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." *Hill*, 151 Ariz. at 84, 725 P.2d at 1118 (quoting Restatement (Second) of Contracts § 161 (1981)).

Whether NIC had sufficient knowledge under the circumstances of this sale to impose on it a duty to disclose is a question of fact to be determined by the jury. *Frazier*, 134 Ariz. at 18, 653 P.2d at 368. Viewing the evidence in a light most favorable to the Alafaces, we determine that there is sufficient evidence to preclude summary judgment. The lot was located in a residential subdivision where other houses were constructed or in the process of being constructed. The real estate purchase contract was contingent upon obtaining a "cabin construction contract." Certainly, a reasonable juror could conclude that NIC knew that the Alafaces intended to build a residence on the lot. In 1982, the Department of Real Estate investigated the activities of NIC with regard to the sale of lots in Diamond Valley. As a result, NIC offered to rescind the earlier sales because the property was in an "illegal subdivision" and agreed to obtain a subdivision public report. Additionally, NIC included in some of the escrow instructions for earlier lot sales a disclaimer as to the availability of water. From this evidence a reasonable fact finder could conclude that NIC knew the Alafaces were purchasing the lot based on the erroneous belief that water was available. Therefore, the trial court erred in granting summary judgment for NIC on the negligent misrepresentation by omission claim.

In addition to a common law duty, the Arizona legislature has, by statute, specified the duty and standard of care governing the conduct of a seller of subdivided lands. The subdivision reporting statutes specify an affirmative duty for certain sellers of real estate to obtain specified information and supply it to the purchaser.

■ A person who violates a statute enacted for the protection and safety of the public is guilty of negligence *per se*. *Good v. City of Glendale*, 150 Ariz. 218, 221, 722 P.2d 386, 389 (App.1986); *Dyer v. Best Pharmacal*, 118 Ariz. 465, 467, 577 P.2d 1084, 1086 (App.1978); *Christy v. Baker*, 7 Ariz.App. 354, 355, 439 P.2d 517, 518 (1968). The *Good* court quoted from Restatement (Second) of Torts, section 286 (1965), to set forth the situations in which the standard of conduct defined by the legislature may be adopted by the court:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment ... whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

150 Ariz. at 221, 722 P.2d at 389.

■ The purpose of statutory provisions regulating subdivided lands "is to insure that consumers who purchase lots in residential developments are provided with adequate streets, utilities, drainage, and generally pleasant, healthy and livable surroundings." *Transamerica Title Ins. Co. v. Cochise County*, 26 Ariz.App. 323, 327, 548 P.2d 416, 420 (1976) (referring to A.R.S. section 11–806.01 which is *in pari materia* with Articles 1 and 4 of Ch. 20, Title 32, A.R.S.). *See generally* John L. McCormack, *An Appraisal of Disclosure Regulation of Subdivided Land Sales*, 1980 Ariz.St.L.J. 705, 707–08. Thus, the subdivision disclosure statutes have been enacted to protect members of the public from being misled into purchasing land that is unusable or unsafe for residential pur-

poses. A purchaser who chooses to pursue a common law remedy rather than a statutory one such as rescission is still entitled to the protections intended by the statutory requirements. *Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 606, 617 P.2d 767, 772 (App.1980).

We disagree with the dissent's narrow interpretation of the term "safety statute." The drafters of the Restatement did not include the term "safety" in section 286. This section contains terminology such as protection of interests from invasion, hazard, and harm. Comment d of the Restatement contains the word "safety" but it is in the context of "the safety of persons or *property.*" (emphasis added). We need look no further than the illustrations given in the Restatement commentary to find examples of negligence *per se* applied in situations involving economic harm as opposed to personal injury. Restatement (Second) of Torts § 286 cmt. i, illus. 4, 5 (1965) (harm to sheep and cattle); *see, e.g., Hurst v. United States*, 739 F.Supp. 1377 (D.S.D.1990) (negligently constructed jetties causing flood damage); *Bennett v. Larsen Co.*, 118 Wis.2d 681, 348 N.W.2d 540 (1984) (negligently applied pesticides causing harm to bees).

█ The subdivision reporting statutes were enacted to protect buyers of subdivision lots like the Alafaces, and, in part, to protect them from buying residential lots not containing the utility services necessary to make the property safe and habitable. The statutes are further intended to protect buyers of residential property like the Alafaces from building improvements that are rendered unusable due to lack of facilities. Therefore, because the subdivision disclosure statutes have been enacted for the protection and safety of the public, one who violates the statutes is guilty of negligence *per se. See Brannigan v. Raybuck*, 136 Ariz. 513, 517, 667 P.2d 213, 217 (1983).

█ The dissent apparently has two objections regarding our holding that a violation of section 32–2181 is negligence *per se:*

1. He does not believe that section 32–2181 was enacted as a safety statute because he fails to see how being without running water makes a property inherently unsafe.

2. He states that the majority cites no authority holding that consumer protection statutes are enacted for public safety or that their violations constitute negligence *per se.*

In answer to both concerns, our reliance on the Restatement (Second) of Torts, section 286 (1965) necessarily includes the comments thereto which are as follows:

**Comment on Clauses (c) and (d):**

i. *When purpose is to protect against particular harm or hazard.* A statute or ordinance may be construed as intended to give protection against a particular form of harm to a particular interest. If so, the violation of the enactment will not be negligence unless the harm which the violation causes is that from which it was the purpose of the enactment to protect the other.

A statute or ordinance may be construed as intended to protect all persons or a particular class of persons against a more or less narrowly restricted type of hazard. If so, the violation of the enactment will not be negligence unless the harm which results to another is caused by his exposure to the hazard from which it was the purpose of the enactment to protect him.

**Illustrations:**

4. A statute, which requires that vessels transporting animals across the ocean shall pen them separately, is construed to be intended only to prevent sickness resulting from contagion by close contact. A ships sheep by B's ship. His sheep are not separately penned, but are herded together with other animals on the upper deck. As a result, some of A's sheep catch a disease from other animals, and others are washed overboard by a storm. The statute established a standard of conduct as to the infected sheep, but not as to those washed overboard.

5. A statute, which requires railroads to fence their tracks, is construed as intended solely to prevent injuries to animals straying onto the right of way who may be hit by trains. In violation of the statute, the A Railroad fails to fence its track. As a result, two of B's cows wander onto the

track. One of them is hit by the train; the other is poisoned by weeds growing beside the track. The statute establishes a standard of conduct as to the cow hit by the train, but not as to the other cow.

These comments and illustrations to the Restatement clearly indicate that the section on which we rely was to protect persons as well as property interests. Furthermore, purchasers of subdivision lots are certainly the class of persons which the statute intended to protect—and that protection was from both physical harm and property damage or economic harm.

As to the dissent's second point regarding negligence *per se*—comment(d) to the same Restatement section states:

> ... [s]tatutory provisions have been accepted by the courts as a basis for civil liability in actions for torts other than negligence, such as trespass, deceit, nuisance, *or even strict liability.*

(emphasis added). This court has held previously that the violation of a safety statute constitutes negligence *per se. Beaty v. Jenkins,* 3 Ariz.App. 375, 376, 414 P.2d 763, 764 (1966). This does not mean that a mere technical violation of the subdivision reporting statutes would subject a seller to tort liability. A plaintiff who makes a claim of negligence *per se* must show that the defendant's actions were the proximate cause of his or her injuries. *Dyer,* 118 Ariz. at 467, 577 P.2d at 1086; *Christy,* 7 Ariz.App. at 355–56, 439 P.2d at 518–19.

We have determined that NIC was subject to the subdivision reporting statutes. Accordingly, if the Alafaces could prove that NIC violated those statutes in the sale of lot 657 and that the violation was the proximate cause of their injuries, NIC would be negligent *per se* for misrepresentation by omission[3] unless NIC establishes a valid excuse for noncompliance.

NIC argues that even if negligence *per se* applies, this claim is a statutory cause of

action and would be barred by the one-year statute of limitations. A.R.S. § 12–541(3).[4] We do not agree that negligence *per se* is necessarily a statutory cause of action. The case of *Murdock v. Balle,* 144 Ariz. 136, 696 P.2d 230 (App.1985), controls this issue.

Arizona's one-year statute of limitation "is applicable where a liability would not exist but for a statute and ... it does not include or extend to actions arising under common law." *Id.* at 138, 696 P.2d at 232. Under *Murdock,* when either a common law or statutory cause of action may be maintained, and the elements of the common law cause of action are different than the elements of the statutory cause of action, different limitations statutes apply to each. *Id.* at 138–39, 696 P.2d at 232–33. *Murdock* involved Arizona's strict liability dog bite statute and the related common law cause of action that requires the owner's knowledge of the dog's vicious propensities. *Id.* at 137, 696 P.2d at 231. This court held that the one-year statute of limitations applies to the statutory cause of action while the two-year personal injuries statute of limitations applies to the common law cause of action. *Id.* at 140, 696 P.2d at 234.

The *Murdock* court pointed to the analogous situation of common law fraud and a statutory cause of action for consumer fraud. *Id.* at 139, 696 P.2d at 233. Consumer fraud does not contain the reliance element found in common law fraud. *Id.* Therefore, consumer fraud is a statutory cause of action with a one-year statute of limitations, while common law fraud comes under a three-year statute. *Id.* (citing *Murry v. Western Am. Mortgage Co.,* 124 Ariz. 387, 604 P.2d 651 (App.1979)).

This case is no different than the common law and consumer fraud line of cases. Under the subdivision reporting statutes, the seller is strictly liable. A.R.S. § 32–2183. If the land is sold prior to issuance of the public report, the purchaser may void the sale. *Id.* at (D). A showing of reliance by the purchaser is not required. Conversely, under a

---

3. Negligent misrepresentation may be by omission or nondisclosure of material facts as well as by overt misrepresentation. *McAlister v. Citibank,* 171 Ariz. 207, 215, 829 P.2d 1253, 1261 (App.1992); *Formento v. Encanto Business Park,* 154 Ariz. 495, 499, 744 P.2d 22, 26 (App.1987).

4. *See* previous discussion "A. Dismissal of Consumer Fraud Claim." p. ——, 892 P.2d p. 1380 *supra.*

negligent misrepresentation cause of action the buyer must show causation. Causation would ordinarily be proved by establishing the purchaser's reliance.

We therefore hold that a negligent misrepresentation action brought on a negligence *per se* theory for a material violation of the subdivision reporting statutes is not a "liability created by statute" under section 12–541(3). The two-year statute of limitations for injury to property, A.R.S. section 12–542, applies to this claim. *See Clark v. AiResearch Mfg. Co. of Ariz.*, 138 Ariz. 240, 673 P.2d 984 (App.1983). Therefore the claim is not barred as a matter of law by the statute of limitations. Whether this claim is in fact barred under the two-year statute of limitations is a question for the trier of fact.

### 3. *Breach of Fiduciary Duty*

The trial court correctly granted summary judgment in favor of NIC on the Alafaces' breach of fiduciary duty claim. NIC and the Alafaces owed no fiduciary duties to each other. *See Oldenburger v. Del E. Webb Dev. Co.*, 159 Ariz. 129, 133, 765 P.2d 531, 535 (App.1988) (finding no fiduciary relationship between home seller and buyer to justify a cause of action for bad faith breach of contract). Therefore, as between the parties to this appeal, no fiduciary duties could have been breached.

### 4. *Common Law Fraud*

To establish actionable fraud, there must be a concurrence of all nine elements. *Pace v. Sagebrush Sales Co.*, 114 Ariz. 271, 275, 560 P.2d 789, 793 (1977). Since the Alafaces have alleged no affirmative misrepresentations by NIC, no common law fraud claim exists. *See Frazier*, 134 Ariz. at 15–16, 653 P.2d at 365–66.

### D. Constitutionality of Summary Judgment

The Alafaces argue that the granting of summary judgment deprived them of their constitutional right to trial by jury. This argument has been raised previously in Arizona and has been found to be without merit. *See Gurr v. Willcutt*, 146 Ariz. 575, 580–81, 707 P.2d 979, 984–85 (App.1985); *Cagle v. Carlson*, 146 Ariz. 292, 297–98, 705 P.2d 1343, 1348–49 (App.1985), *cert. denied*, 476 U.S. 1108, 106 S.Ct. 1956, 90 L.Ed.2d 365 (1986). As explained by the *Cagle* court, "the granting of summary judgment does not deprive a plaintiff of his constitutional rights to a jury trial because, in such cases, there are simply no genuine issues of fact for a jury to consider." 146 Ariz. at 298, 705 P.2d at 1349.

### E. Cross–Appeal Regarding Attorneys' Fees

NIC argues on cross-appeal that the trial court erred in denying its request for attorneys' fees because the purchase contract and receipt for deposit provided for an award of fees to the prevailing party in an action to enforce the contract. The parties disagree on the effect of the fact that NIC did not execute the purchase contract, the fact that none of the parties had a copy of the page of the contract that contained the fees provision, and the inconsistent positions taken by the parties in the trial court, *i.e.*, NIC's argument that the Alafaces were not entitled to fees under the contract but NIC was.

Without deciding all the points upon which the parties disagree, we find that the attorneys' fees provision of the contract does not apply to entitle either party to an award of fees because the Alafaces did not file suit to enforce the contract. The provision provides in relevant part:

> **Default and Remedies.** If Buyer fails to pay the balance of the cash purchase price when due, or otherwise defaults in any respect on any material obligation under this Contract, Seller may elect to be released from the obligation to sell the Premises to Buyer. Seller may proceed against Buyer upon any claim or remedy which he may have, in law or equity, or because it would be difficult to fix actual damages in case of Buyer's default, the amount of the earnest money deposit may be deemed a reasonable estimate of the damages, and the Seller may, at his option, retain the earnest money deposit as his sole right to damages. If Buyer or Seller files suit against the other to enforce any

provision of this Contract or for damages sustained by reason of its breach, all parties prevailing in such action, on trial and appeal, shall receive their reasonable attorneys' fees and costs as awarded by the court....

The intent of this attorneys' fees provision, read in the context of the entire provision, is to allow fees in an action to enforce the purchase contract. The Alafaces did not sue NIC to enforce the contract. In fact, the Alafaces' complaint does not contain any breach of contract claim against NIC. The only breach of contract allegation is against the escrow agent. Although the negligence claims may have arisen out of contract for purposes of a statutory award of fees, the contract provision at issue does not allow fees for negligence claims arising out of the contract. Instead, fees under the provision are available only in actions filed to enforce a provision of the contract or to recover damages sustained due to breach of the contract. The Alafaces neither sought to enforce a provision of the contract nor did they allege a breach of the contract. Therefore, the provision does not support an attorneys' fees award for NIC.

NIC argues no other grounds for reversal of the trial court's denial of its fees request. Therefore, we affirm the trial court on this issue.

## CONCLUSION

In summary, we affirm the trial court's dismissal of the Alafaces' consumer fraud claim. We also affirm the trial court's entry of summary judgment in favor of NIC on the common law fraud claim, statutory violations claim, and negligent misrepresentation claim against NIC based on agency principles. We reverse the trial court's grant of summary judgment on the negligent misrepresentation by omission and negligence *per se* claims. We affirm the trial court's denial of an attorneys' fees award to NIC.

Both parties have requested fees on appeal. NIC cites as support for its request A.R.S. section 44–101, A.R.S. section 12–341.01 and *First Federal Sav. & Loan Ass'n of Phoenix v. Ram,* 135 Ariz. 178, 659 P.2d

1323 (App.1982). We decline to award fees on appeal to NIC for the same reasons we stated in affirming the trial court's denial of NIC's fees request on the cross-appeal. Additionally, since both parties have prevailed as to either the appeal or cross-appeal, in the exercise of our discretion, we decline to award fees to either party.

This case is remanded to the trial court for further proceedings consistent with this opinion.

EHRLICH, J., concurs.

VOSS, Judge, concurring in part, dissenting in part.

I concur with the majority opinion with one exception: I do not agree that a violation of A.R.S. section 32–2181 is negligence *per se* because I do not believe section 32–2181 qualifies as a statute intended "for the safety of others." *Ontiveros v. Borak,* 136 Ariz. 500, 511, 667 P.2d 200, 211 (1983).

The majority bases its holding on the following statement:

> The subdivision reporting statutes were enacted to protect buyers of subdivision lots ... from buying residential lots not containing the utility services necessary to make the property safe and habitable.... Therefore, because the subdivision disclosure statutes have been enacted for the protection and safety of the public, one who violates the statutes is guilty of negligence *per se*.

*Supra,* at 597, 892 P.2d at 1386. I am unpersuaded by this conclusory reasoning and find little support in either the Restatement (Second) of Torts, section 286 (1965), or the cases cited by the majority for their holding that negligence *per se* exists when a subdivider fails to file a notice under A.R.S. section 32–2181 and thereby misleads purchasers of the subdivided lands.

In Arizona, the rule is that actionable negligence *per se* exists when: (1) the defendant has violated a statute enacted as a safety regulation, *Brannigan v. Raybuck,* 136 Ariz. 513, 667 P.2d 213 (1983); *J.H. Welch & Son Contracting Co. v. Gardner,* 96 Ariz. 95, 392 P.2d 567 (1964); *Salt River Valley Water Users' Ass'n v. Compton,* 39 Ariz. 491, 496, 8

P.2d 249, 251 (1932), *overruled on other grounds by MacNeil v. Perkins,* 84 Ariz. 74, 324 P.2d 211 (1958); (2) the plaintiff is part of the class of persons that the statute was designed to protect, *Hidalgo v. Cochise County,* 13 Ariz.App. 27, 474 P.2d 34 (1970); (3) the violation of the statute is either unexcused or inexcusable, *Brannigan,* 136 Ariz. at 517, 667 P.2d at 217; and (4) the violation is the proximate cause of the injury, *Young Candy & Tobacco Co. v. Montoya,* 91 Ariz. 363, 372 P.2d 703 (1962); *Gray v. Woods,* 84 Ariz. 87, 324 P.2d 220 (1958).

That a statute needs to have public safety as part of its purpose has been stated explicitly in the substantial majority of Arizona appellate decisions where the doctrine has been invoked.[5] This public safety aspect of negligence *per se* is also implicit in the remaining Arizona cases on point, all of which involve statutes with a clear public safety purpose.[6] I find no such purpose in the requirements of A.R.S. section 32–2181.

While I agree that the availability of water has a substantial impact on habitability, it is unclear to me how failing to file a notice disclosing, among other things, the name and address of the property owner,[7] the location of the nearest public schools,[8] the availability of utilities,[9] and the approximate amount of annual taxes,[10] places potential buyers in harm's way. If appellee had violated a statute requiring disclosure of dangerous conditions on the land, e.g., sinkholes, toxic waste, I would tend to agree with the majority's analysis, but a seller's failure to disclose the fact that no water hookup is available does not expose purchasers or their property to some unforeseen physical damage. Thus, I disagree that section 32–2181 was enacted as a safety statute.

The majority states that my definition of a safety statute is too narrow, and cites cases from other states and the illustrations given in the Restatement as examples of negligence *per se* being applied to economic harms. These examples are inapposite. The harms they describe are "economic" only in that it costs money to remedy them. They

**5.** *Brannigan v. Raybuck,* 136 Ariz. 513, 667 P.2d 213 (1983); *Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983); *Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977); *Konow v. Southern Pac. Co.,* 105 Ariz. 386, 465 P.2d 366 (1970); *Rogers v. Mountain States Tel. & Tel. Co.,* 100 Ariz. 154, 412 P.2d 272 (1966); *J.H. Welch & Son Contracting Co. v. Gardner,* 96 Ariz. 95, 392 P.2d 567 (1964); *Mercer v. Vinson,* 85 Ariz. 280, 336 P.2d 854 (1959); *Cobb v. Salt River Valley Water Users' Ass'n,* 57 Ariz. 451, 114 P.2d 904 (1941); *Salt River Valley Water Users' Ass'n v. Compton,* 39 Ariz. 491, 496, 8 P.2d 249, 251 (1932); *Carrillo v. El Mirage Roadhouse, Inc.,* 164 Ariz. 364, 793 P.2d 121 (App.1990); *Monares v. Wilcoxson,* 153 Ariz. 359, 736 P.2d 1171 (App.1987); *Good v. Glendale,* 150 Ariz. 218, 722 P.2d 386 (App.1986); *Gibson v. Boyle,* 139 Ariz. 512, 679 P.2d 535 (App.1983); *Dyer v. Best Pharmacal,* 118 Ariz. 465, 577 P.2d 1084 (App.1978); *Anderson Aviation Sales Co. v. Perez,* 19 Ariz.App. 422, 508 P.2d 87 (1973); *Worthington v. Funk,* 7 Ariz.App. 595, 442 P.2d 153 (1968); *Christy v. Baker,* 7 Ariz.App. 354, 439 P.2d 517 (1968); *Beaty v. Jenkins,* 3 Ariz.App. 375, 414 P.2d 763 (1966).

**6.** *Orlando v. Northcutt,* 103 Ariz. 298, 441 P.2d 58 (1968) (motor vehicle statute requiring drivers to signal before turning); *Brand v. J.H. Rose Trucking Co.,* 102 Ariz. 201, 427 P.2d 519 (1967) (Interstate Commerce Commission Motor Carrier Safety Regulations); *Dobbertin v. Johnson,* 95 Ariz. 356, 390 P.2d 849 (1964) (traffic ordinance); *Young Candy & Tobacco Co. v. Montoya,*

91 Ariz. 363, 372 P.2d 703 (1962) (statute relating to the operation of motor vehicles); *Caldwell v. Tremper,* 90 Ariz. 241, 367 P.2d 266 (1962) (concerning liability for death which resulted when defendant's illegally modified and overloaded trailer broke loose from his panel truck); *Campbell v. Brinson,* 89 Ariz. 197, 360 P.2d 211 (1961) (statute requiring that vehicles be "in such safe mechanical condition as not to endanger ... any person upon the highway"); *Gray v. Woods,* 84 Ariz. 87, 324 P.2d 220 (1958) (motor vehicle statute); *Anderson v. Morgan,* 73 Ariz. 344, 241 P.2d 786 (1952) (motor vehicle statute); *Valley Transp. System v. Reinartz,* 67 Ariz. 380, 197 P.2d 269 (1948) (statutory duty to move stalled vehicle off the roadway); *Phoenix v. Mullen,* 65 Ariz. 83, 174 P.2d 422 (1946) (motor vehicle statute); *Pratt v. Daly,* 55 Ariz. 535, 104 P.2d 147 (1940) (statute prohibiting the sale of liquor to an intoxicated person), *overruled in part by Ontiveros,* 136 Ariz. 500, 667 P.2d 200; *Hall v. Mertz,* 14 Ariz.App. 24, 480 P.2d 361 (1971) (city ordinance requiring that nothing be erected or maintained at a corner so as to interfere with traffic visibility across the corner).

**7.** A.R.S. § 32–2181(A)(1) (Supp.1993).

**8.** A.R.S. § 32–2181(A)(9) (Supp.1993).

**9.** A.R.S. § 32–2181(A)(19) (Supp.1993).

**10.** A.R.S. § 32–2181(A)(15) (Supp.1993).

are all examples of physical harm or damage to persons or property resulting from statutorily regulated hazards such as floods, pesticides, disease, and railroad tracks. These hazards and their concomitant harms are simply not analogous to NIC's violation and its effect on the Alafaces.

I also disagree with the majority's interpretation of section 286 of the Restatement (Second) of Torts. The majority seems to read this section as saying that a statute may be the basis for negligence *per se* if the purpose of the statute relates to some part of subsections 286(a)–(d). This is incorrect. The words "exclusively or in part" in section 286 refer to the purpose of the statute, not subsections (a)–(d). Restatement (Second) of Torts, § 286 (1965). Those subsections are conjunctive, indicating that a statute's purpose must satisfy all four criteria if the statute is to be used as a standard for negligence *per se*. It is clear the majority has stopped too soon in finding it sufficient that A.R.S. section 32–2181 was intended to protect a particular interest of a class of persons. As Restatement subsection 286(d) makes clear, negligence *per se* statutes also need to be designed to protect against a particular hazard.[11] Thus, the fact that a statute is designed to protect the public in some fashion is insufficient grounds for making the violation of it negligence *per se*.

To hold otherwise has the potential of making the violation of virtually any statute grounds for negligence *per se* liability. Using the majority's expansive approach to negligence *per se* under section 32–2181, for example, one can now argue that a subdivider should be liable on a theory of negligence *per se* if it fails to comply with subsection (A)(11) and buyers who relied on that omission are later disappointed to discover they cannot paint their house chartreuse.[12] I cannot agree that negligence *per se* should be applied to such claims and harms.

Thus, without reference to negligence *per se*, I would reverse the trial court's grant of summary judgment on appellants' common law negligent misrepresentation by omission claim, affirm in all other respects, and remand this case to allow appellants to prove their remaining theory of liability based solely on the common law standard for disclosure outlined in *Hill v. Jones*, 151 Ariz. 81, 725 P.2d 1115 (App.1986) and *Frazier v. Southwest Sav. and Loan Ass'n*, 134 Ariz. 12, 653 P.2d 362 (App.1982).

---

11. The majority's observation that section 286 does not include the term safety is a distinction without a difference. Saying that a statute's purpose is "to protect ... against [a] particular hazard" is, in my mind, no different than saying its purpose is safety. The dictionary defines hazard as: "A chance of being injured or harmed ... a possible source of danger...." American Heritage Dictionary 830 (3d ed. 1992). Clearly, the opposite of this is safety or protection.

12. Subsection (A)(11) requires that the notice contain: "A statement of the provisions ... limiting the use or occupancy of the parcels in the subdivision, together with copies of any restrictive covenants...." A.R.S. § 32–2181(A)(11) (Supp.1993).