**IT IS HEREBY ORDERED** that respondents' motion to dismiss [# 11–1, # 11–2] is granted.

**IT IS FURTHER ORDERED** that Jakov Anic's petition and amended petition for a writ of habeas corpus under 28 U.S.C. § 2241 [# 1, # 17–1, # 17–2] are dismissed for lack of jurisdiction.

**IT IS FURTHER ORDERED** that the preliminary injunction previously entered in this matter is VACATED.

**PREMIER BANK, et al., Plaintiffs,**

v.

**Thomas W. TIERNEY, et al., Defendants.**

**No. 95–1003–CV–W–6.**

United States District Court, W.D. Missouri, Western Division.

Sept. 27, 2000.

---

2. Notwithstanding the government's assertion that "[t]he scope of whatever judicial review remains in cases such as Anic's is a question for the Court of Appeals to resolve," I find it necessary to consider the avenues of review left open by § 242(a)(2)(C) in addressing the constitutionality of § 242(b)(9).

879

Michael P. Healy, The Healy Law Firm, LLC, Kansas City, MO, for Premier Bank.

L.J. Buckner, Jr., Lathrop & Gage, Kansas City, MO, for Thomas W Tierney.

W. Perry Brandt, Kurt D. Williams, Berkowitz, Feldmiller, Stanton, Brandt, Williams, & Stueve, LLP, Kansas City, MO, George E. Feldmiller, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Stueve, Kansas City, MO, for KMPG Peat Marwick.

Brian L. Warr, Welch, Martin, Albano & Manners, P.C., Independence, MO, for Wright, Herfordt & Sanders.

Craig T. Kenworthy, Swanson Midgley, LLC, Kansas City, MO, Robert R. Barton, Evans & Dixon, L.L.C., Kansas City, MO, for Harold E. Card, Carl E. Wright, Raymond Jallow.

Donald E. Howell, Jr., Florissant, MO, for Ira W Palmer.

Dale A. Kimball, Robert S. Clark, Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, UT, for John P Redd.

Benjamin F. Mann, Blackwell Sanders Peper Martin, LLP, Kansas City, MO, for National Union Fire Insurance Company of Pittsburgh, PA.

## MEMORANDUM AND ORDER

SACHS, District Judge.

Premier Bank, as trustee for the purchasers of industrial revenue bonds issued in 1983 for the construction of four ethanol plants in New Iberia Parish, Louisiana, filed suit against directors, accountants, and attorneys for a group of companies known as the Midwestern Companies. The ethanol plants did not generate sufficient revenues to pay the bonds, and Midwestern went into bankruptcy in 1984. Except for two defaulting individual defendants, the post-bankruptcy litigation was dismissed as untimely, a ruling that was affirmed on appeal. *See Premier Bank v. Tierney,* 155 F.3d 1045 (8th Cir.1998). One of the defaulters settled; the other, Dr. Raymond Jallow, is still the target of litigation.

The Bank seeks a default judgment for over $11 million, plus interest. A two-day hearing was scheduled, but complications arose as to the issues to be heard. Attempts to narrow the issues have been made by motion, briefs and argument; meanwhile, Dr. Jallow seeks summary judgment on two legal grounds allegedly not barred by the default: (1) the Bank has no standing to pursue a negligence claim against him, as a former director, and any attempt to substitute the bondholders would allow him to successfully raise the issue of the statute of limitations; and (2) Dr. Jallow joined the board of directors almost contemporaneously with the bond sales, and subsequent to any misrepresentations regarding the financial condition of the companies, so any claim against him is necessarily based on a novel theory that a presumably knowledgeable director has a legal duty in Missouri to become a "whistle-blower" on behalf of creditors. Since the bond receipts had not been distributed, the Bank contends that they could have been recovered if prior misrepresentations regarding Midwestern's financial condition had been disclosed by a company "insider." [1]

1. A timeline of relevant events might assist the uninitiated reader. The "Preliminary Offering Statements" regarding the ethanol plants, which misrepresented Midwestern's financial state, were issued on May 20, 1983. Dr. Jallow became a director on May 25,

I have concluded that both defenses survive the default under the particular circumstances of this case and are well taken. Therefore, Dr. Jallow will join the other co-defendants in escaping major recovery by the Bank and the bondholder-creditors. It is possible, however, that Dr. Jallow remains subject to sanctions for his more recent misconduct in falsely denying he was served with process, and the court will retain jurisdiction to resolve that question.[2]

## I. STANDING

 Generally, a default by a defendant is fatal to claims of nonliability, but there are a fair number of well-settled exceptions, one being where the pleadings "disclose on their face a fact that would defeat the (plaintiff's) claim." *Nishimatsu Constr. Co. v. Houston National Bank,* 515 F.2d 1200, 1206 (5th Cir.1975). In *Nishimatsu,* a note attached to the third-party complaint showed, contrary to the allegations, that the individual third-party defendant was not individually liable, but had signed as agent. *See id.* at 1206–07. Also fatal to a claim is where a necessary allegation is "contrary to uncontroverted material in the file of the case." *Trans World Airlines, Inc. v. Hughes,* 308 F.Supp. 679, 683 (S.D.N.Y.1969), *modified on other grounds,* 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973). More fundamentally, although the default leaves Jallow unable to controvert any "well pleaded allegations" against him, *see Hughes,* 449 F.2d at 73–74, it neither admits any legal arguments made in the pleadings nor requires the court to award a judgment for legally unsound claims. *See Black v. Lane,* 22 F.3d 1395, 1399 (7th Cir.1994); *Aldabe v. Aldabe,* 616 F.2d 1089, 1092–93 (9th Cir.1980); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure, Civil 3d* § 2688, at 63 (1998) ("Even after default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.").

### A. The Claims Brought on the Bondholders' Behalf

 The claims against Dr. Jallow lack merit because the Bank has no standing to bring them—an issue of law that survives the default.[3] A trustee's powers derive from the instruments creating the trust relationship. *See, e.g., Navarro Savings Ass'n v. Lee,* 446 U.S. 458, 464–65, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); *Continental Bank v. Caton,* No. 88–1611–C, 1990 WL 129452, at *6 (D.Kan. Aug.6, 1990); *Citibank v. Miller & Schroeder Fin., Inc.,* 168 Ariz. 178, 812 P.2d 996, 1000 (App.1990) ("To determine whether United Bank has standing and whether this case represents a justiciable controversy, we

1983, and the bonds were sold on June 1, 1983. The bond closing occurred on June 9, 1983, along with the issuance of a finalized version of the POS, which was identical to the preliminary one. Finally, the requisitioning process of bond funds continued throughout the remainder of 1983.

**2.** I remain of the opinion, as expressed in the court's order of April 12, 1999, that a sanction approximating $100,000 is probably appropriate.

**3.** Moreover, the court is convinced that Dr. Jallow could successfully assert the statute of limitations if the bondholders were to pursue him themselves. The default waived that particular defense with respect to the claims asserted, but not as to any and all claims that could have been asserted—whether by the plaintiff, the bondholders, or others. At least in theory Dr. Jallow might not have defaulted if a party with proper standing had brought the claims at issue. "The theory of [Rule 54(c) ] is that the defending party should be able to decide whether to expend the time, effort and money necessary to defend the action. It would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give a different type of relief or a larger damage award." Wright, Miller & Kane, *supra* § 2663, at 166–67.

turn to the indenture agreement."). "Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985), quoted in *Continental*, 1990 WL 129452, at *6. In the present case, the Bank alleged (1) that by reason of its Leasehold Mortgage and Indenture of Trust, it had authority "to pursue all claims on behalf of the bondholders, including the claims herein alleged," and (2) that holders of the bonds and coupons had assigned to the Bank the right to institute any suit to enforce the Mortgage or Indenture, including the present claims. Amended Complaint, ¶¶ 5, 50.

■ The Indenture and Mortgage simply do not bear the weight placed upon them.[4] Specifically, they permit the Bank to pursue the bondholders' claims to enforce the bonds themselves, or to enforce the mortgage lien on the ethanol projects, but they nowhere permit the trustee to pursue the bondholders' freestanding tort claims against Midwestern's directors.

—Section 909 of the Indenture (Plaintiff's Ex. 38), "Remedies Vested in Trustee" provides:

All rights of action ... *under this Mortgage and Indenture of Trust or under any of the bonds or coupons* may be enforced by the Trustee without the possession of any of the Bonds or coupons or the production thereof in any trial or other proceedings relating thereto[,] and *any such suit* or proceeding instituted by the Trustee shall be brought in its name as Trustee without the necessity of joining as plaintiffs or defendants any holders of the Bonds, and any recovery of judgment shall ... be for the equal benefit of the holders of the outstanding Bonds and coupons.

(emphases added). The language speaks only of legal actions brought to enforce the Indenture, Mortgage, and bonds or coupons. No authority is conferred to pursue separate tort actions at all, much less against a party such as Dr. Jallow—a party distinct from the obligor under the bonds. *See Continental*, 1990 WL 129452, at *4–*7 (so construing similar trust indenture language and holding that trustee lacked standing to assert claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5).

—Section 904 of the Indenture, "Other Remedies," provides that

No remedy by the terms of this Leasehold Mortgage and Indenture of Trust conferred upon or reserved to the Trustee (or to the bondholders) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Trustee or to the bondholders hereunder or now or hereafter existing at law or in equity or by statute.

In other words, no remedy conferred by the documents excludes any other remedy that might arise from the documents or elsewhere under the law. The Indenture does not state, however, that the trustee shall have remedies other than those already given to it by the documents and the law. The trustee's power to assert such claims must arise from the documents creating the trust relationship, as explained above. *See National City Bank v. Coopers & Lybrand*, 409 N.W.2d 862, 866 (Minn.Ct.App.1987). The law presumes that the bondholders' claims rest with the bondholders. The Indenture overcomes this presumption, but only as to those rights of the bondholders that arise from the bonds, the Indenture, or the Mortgage. The non-exclusion of other remedies already belonging to the *trustee* does not create an assignment of additional reme-

---

4. Their meaning is not only.a question of law, *see Continental*, 1990 WL 129452, at *3, but the documents themselves are in the court's records, are of unchallenged authenticity, and plainly contradict the complaint's characterization of them.

dies belonging to the *bondholders*. A right declared non-exclusive is not thereby made all-inclusive.

The cases relied upon by plaintiff are distinguishable because they involve broader grants of trustee authority than that described above. *See Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1280 (9th Cir. 1992) (trustee had standing to bring extrinsic tort and fraud claims, where indenture permitted trustee to "enforce its rights and the rights of the holders of the Bonds under the Resolution ... in the enforcement of any other legal or equitable right as the Bond Fund Trustee, being advised by counsel, shall deem most effectual to enforce any of its rights or the rights of the holders of the Bonds."); *Continental Bank v. Ludlow,* 777 F.Supp. 92, 97–98 (D.Mass.1991) (trustee could bring contract claim on behalf of bondholders, where Bond Resolution allowed trustee to "take such steps and institute such suits, actions or proceedings in its own name, ..., or in the name of the Bondholders, all as the Bond ·Fund Trustee may deem appropriate, for the protection and enforcement of the rights of the holders of bonds and the coupons appurtenant thereto.").[5]

—A similar provision in the Mortgage, "Other Remedies; Cumulative Rights" carries the same legal effect. *See* Plaintiff's Ex. 40, at 6–7. It states:

> If any Event of Default occurs and is continuing, the Mortgagee [the Bank's predecessor, Louisiana National Bank] before or after declaring the principal of the Bonds immediately due and payable, may enforce each and every right granted to the Mortgagee in the Indenture and any supplements or amendments thereto, *and otherwise as may be provided by any other law or statute or otherwise.* No remedy conferred upon or reserved to the Mortgagee by this Mortgage is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Mortgage or now or hereafter existing in law.

(emphasis added). Plaintiff relies heavily on the italicized language, but the provision only confers (a) rights already conferred by the Indenture and Mortgage, and (b) rights already conferred by other sources of law. There is no pre-existing right for the Bank to bring third-party tort claims on behalf of the bondholders. Such a right must be given by the bondholders, for it is they who are provided it by the law.

—The Indenture's Section 905, "Right of Bondholders to Direct Proceedings," permits the bondholders, under certain circumstances, to direct legal proceedings taken "in connection with the enforcement of the terms and conditions of this Leasehold Mortgage and Indenture of Trust, or for the appointment of a receiver or any other proceedings hereunder." Again, no reference is made to any tort claims that the bondholders might bring against third parties such as Dr. Jallow; the provision speaks only of legal actions brought to enforce the Indenture, Mortgage, and bonds. A tort claim extrinsic to the Indenture is not brought "hereunder."

---

**5.** Finally, the court is unpersuaded by the Bank's reliance on *In re Petition of First Interstate Bank of Denver,* 767 P.2d 792 (Colo.Ct. App.1988). The Colorado court interpreted language similar to Section 904 as meaning that "[T]he trustee is not limited to the remedies listed in the indenture." *Id.* at 795. Yet, the particular remedy pursued by the trustee—recommending that a probate court approve the proposed cancellation and refinancing of bonds—is perhaps more inherent to that trustee's role in safeguarding the bondholders' interests than is the pursuit of third-party tort claims on behalf of bondholders whose intentions might differ from the trustee's. More importantly, *First Interstate* largely ignores the limitation of indenture trustees' authority to those powers specifically enumerated (see *supra* page 4). The decision instead rests upon the more general common-law proposition that trustees may exercise non-enumerated powers deemed necessary for accomplishing the trust's purpose. *See id.* at 795. Perhaps the dissent has the better of the argument. *See id.* at 797–98 (Van Cise, J., dissenting).

—Section 910 of the Indenture, "Rights and Remedies of Bondholders," restricts the bondholders' rights to intrude on the trustee's enumerated spheres of authority:

> No holder of any Bond or coupon shall have any right to institute any suit, action or proceeding in equity or at law *for the enforcement of this Leasehold Mortgage and Indenture of trust* or for the execution of any trust thereof or for the appointment of a receiver or any other remedy *hereunder,* . . .

(emphases added). The types of claims now at issue are not among those specified as belonging to the trustee.

██ Unable to show that language in the Indenture and Mortgage confer standing to assert the bondholders' tort claims against Dr. Jallow, the Bank contends (1) that it can otherwise prove by affidavits and other evidence that the signatories to the bond issue understood that the trustee could pursue the bondholders' claims against Midwestern's directors should any such claims arise, and (2) that the Amended Complaint, ¶ 50, alleges such an assignment to the Bank, the validity of which was admitted by Dr. Jallow's default. This argument, too, is unavailing. First, the validity and scope of the assignment, if any, depends upon the construction of the Indenture and Mortgage—a question of law. *See Continental,* 1990 WL 129452, at *3. Embedded in ¶ 50 is a legal contention that the right to pursue the asserted claims falls within the Bank's right to enforce the Mortgage and Indenture "or any other remedy *thereunder.*" That contention is neither sound nor deemed admitted by the default. Further, the claimed assignment is inherently inconsistent with the contention that the instrument itself confers authority.[6] Second, any attempt to clarify the Mortgage and Indenture with extrinsic evidence would fail as a matter of law (setting to one side the fact that plaintiff has not actually adduced the affidavits described). The documents speak for themselves and are unambiguous, which prevents the court from considering extrinsic evidence of the parties' intent. *See Continental,* 1990 WL 129452, at *5 (following Kansas law to that effect); *Commerce Trust Co. v. Duden,* 523 S.W.2d 97, 99–100 (Mo.Ct.App.1975) ("The paramount rule, that absent ambiguity the intent of the maker of a legal instrument is to be ascertained from the four corners of the instrument without resort to extrinsic evidence, is here deemed applicable . . . In many instances extrinsic evidence as to intent is the 'handmaiden' of confusion. Therefore extrinsic evidence, although introduced at the trial level, will not be considered, and the subject of this court's decisional focus will be the trust instrument itself.").

██ The Bank next argues that Fed. R.Civ.P. 17(a) gives it standing to pursue the negligence claims against Dr. Jallow, since the trustee of an express trust is the "real party in interest" under Rule 17 and may sue in its own name without joining the beneficiaries. This argument ignores the particular scope of the Bank's trustee status under the Indenture. "Rule 17(a) does not support the proposition that all trustees, regardless of the terms of the respective trust indentures, may bring any type of suit on behalf of the trust beneficiaries." *Continental,* 1990 WL 129452, at *4. The Bank is not a trustee with respect to the bondholders' claims against Midwestern's directors, as the Indenture and Mortgage make clear. Rule 17 does not confer upon the Bank any trustee authority that it otherwise lacks. Nor did Dr. Jallow waive the argument by defaulting. The Bank's lack of standing to bring these claims removes the court's jurisdiction to hear them.[7] *See Whitmore v. Arkansas,* 495 U.S. 149, 154–55, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (describing Article III standing as a jurisdictional prerequisite). Whatever ill effects Dr. Jallow's negli-

---

**6.** It is also noted the Bank offers to supply affidavits as to "intent" in 1983 but offers no documentation of assignments by the bondholders.

**7.** Part II of this Order is provided, however, as an alternative basis for judgment in favor of Dr. Jallow in the event that I have erred in my analysis of the standing issue.

gence may have visited upon the bondholders, they fall outside the Bank's role as trustee and have not wrought upon *the Bank* an "injury in fact" within the meaning of Article III. For that matter, even if the defect were not jurisdictional, the Bank's authority to bring these claims is a question of law not waived by the default. Either (1) the Bank has no Article III standing to bring these particular claims against this particular defendant, or (2) the asserted source of legal authority (the Indenture and Mortgage) do not give *the Bank* a viable cause of action to pursue the claims at issue.[8] In either case, the Bank cannot prevail.

## B. The Bank's Own Claim against Dr. Jallow

Finally, the Bank argues, and Dr. Jallow concedes, that it has standing to pursue its own claim that Dr. Jallow accepted bond proceeds as repayment for a sizeable loan he made to Midwestern. The theory behind this claim is not entirely clear. It may be that plaintiff targets only the bond funds wrongfully used to pay off the loan. On the other hand, had Dr. Jallow informed the trustee during the summer of 1983 that he had accepted $1.5 million in bond funds as repayment for the loan, the argument might go, the trustee would have investigated the matter, discovered the underlying fraud regarding the financial soundness of Midwestern and its ethanol projects, and timely recouped the bond proceeds. If adequately pleaded, such an allegation would doubtless be binding on Dr. Jallow (at least to the extent of the wrongful diversion) as a form of misconduct admitted by reason of the default.

The initial problem is that nowhere in the pleadings is fair notice given of such a claim. The issue is further complicated by the Bank's disclaimer in briefing of a contention that it implicitly alleged conversion or even diversion of this large chunk of

bond funds. On the contrary, the Bank states that Dr. Jallow "is liable to Premier under a theory of negligence: His *decision* to not tell the IRB trustee that he accepted $1.5 million in bond funds to pay back a loan was negligence." Doc. 232, p. 10.

■ I am satisfied that under Fed. R.Civ.P. 8, the most liberal reading of "notice pleading" would not sanction burying such a major claim (if intended by the pleader) in the Amended Complaint's general allegations. The Bank fails to cite any particular allegation that could generally refer to this claim. It is true that there are allegations of "concealment of Midwestern's poor financial condition" (¶ 304, p. 104) and "failing to inform the public of material information which the Director and Officer defendants knew or should have known to be necessary for accurate financial evaluation...." (¶ 300(c), p. 102). At best, I assume this refers to the pattern of falsifying income and profits, by using unsound accounting practices, and arguably the falsification of the completion status of ethanol plants in New Mexico and the like—the subjects of much prior litigation and criminal prosecutions of other co-defendants. The Bank makes no effort to give a practical construction of notice pleading concepts that would justify the over-reaching assertion now stated that Dr. Jallow had notice through pleading of a claimed failure to disclose the $1.5 million diversion of bond funds. The question may well be whether relief is possible "under any set of facts that could be proved consistent with the allegations," *see Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), but the facts now urged are not rendered "consistent with the allegations" simply because the pleadings do not preclude their occurrence. A default admits what the complaint fairly pleads, not what the complaint leaves metaphysically conceivable.[9]

8. The distinction between the soundness of one's claim and one's standing to pursue it can be elusive, as explained by Professor (now Judge) William A. Fletcher. *See The Structure of Standing*, 98 Yale L.J. 221, 234–39 (1988).

9. For example, the Amended Complaint does

Most pointedly, however, the Bank makes no effort to bring the claim within the special pleading requirements in default practice that relate back to guidelines established by the Supreme Court dating back to the 1880s and never materially changed. Those requirements are set forth in "venerable" but "still definitive" caselaw. *Nishimatsu,* 515 F.2d at 1206. In his opinion, Judge Wisdom referred to the need for "well-pleaded allegations of fact," which comports with the older caselaw. *Id.; see also* Wright, Miller & Kane, *supra,* § 2688, at 63.[10]

The Eighth Circuit Court of Appeals has noted that a defaulting defendant is "deemed to have admitted all well-pleaded allegations in the complaint." *Taylor v. City of Ballwin, Missouri,* 859 F.2d 1330, 1333 n. 7 (8th Cir.1988). I do not read this as a rejection of the somewhat protective pleading requirements of the Supreme Court cases cited in *Nishimatsu.* But even if it were, the Amended Complaint lacks any hint, much less a "well-pleaded allegation," of the Bank's newly-minted "silent diversion" theory of negligence.

There is a considerable difference between evaluating pleadings when they simply trigger litigation, and are expected to be fleshed out in discovery and possibly further amendments, and evaluating pleadings when they frame the outcome of the case after a default. A defaulting defendant may not be entitled to much sympathy, but is entitled to make a decision whether to contest pleadings by being placed on adequate notice of what plaintiff really claims. *See* Fed.R.Civ.P. 54(c) ("A judgment by default shall not be different in kind from or exceed in amount that prayed for in demand for judgment."); Charles A. Wright, Arthur R. Miller &

Mary Kay Kane, *supra,* § 2663, at 166–67. Even the most fertile imagination could not dream up plaintiff's current theory that Dr. Jallow was being charged with negligent silence in failing to publicize the $1.5 million diversion of bond funds to repay the monies advanced by him on a construction loan for the ethanol plants.

The Bank might amend its complaint to assert such a claim, but Dr. Jallow would doubtless raise his meritorious statute of limitations defense. Since the amendment would describe a transaction absent from the previous complaint and separate from those described therein, it would not "relate back" to a date preceding the default. *See* Fed.R.Civ.P. 15(c)(2); *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1543 (8th Cir.1996) ("The basic inquiry is whether the amended complaint is related to the general fact situation alleged in the original pleading").

To summarize: Dr. Jallow's default does not impair his ability to challenge the legal sufficiency of the claims asserted. All such claims are insufficient as a matter of law. The bank lacks standing to bring all of them except its own "silent diversion" theory. Its own claim fails, however, because the theory pursued has no genesis in the Amended Complaint and cannot form the basis of a default judgment.

## II. THE "SILENT DIRECTOR" THEORY OF LIABILITY AND DAMAGES

Aside from the Bank's lack of standing, the negligence claims against Dr. Jallow fail because they are untenable under Missouri law. The Bank asserts claims of negligence and negligent misrepresentation based on Dr. Jallow's failure to

---

not preclude the possibility that Dr. Jallow went to Louisiana before he became a director and orally falsified the financial soundness of the bonds, but its silence on this point does not make the default an admission of liability.

**10.** It may be assumed, however, that only ultimate facts must be alleged in order to be

binding; for example, a simple allegation of insolvency is sufficient without going into details. *See Danning v. Lavine,* 572 F.2d 1386, 1389 (9th Cir.1978) (Kennedy, J.). Even so, the diversion theory is not plausibly explained to fall within the Amended Complaint's ultimate facts.

apprise the bondholders, or anyone else, of Midwestern's troubled condition during the last few days before the bond sale or the longer period thereafter. I assume, arguendo, there was a period of time in mid–1983 when the bond funds might have been recouped if a responsible corporate official had broken with his fellow speculators and manipulators and publicized the true status of finances and operations of Midwestern. The Bank has failed, however, to show there is Missouri caselaw (or general caselaw likely to be adopted in Missouri) that would impose a legal duty to creditors for a director to go public and blow the whistle on financial problems in the company.[11] This failure dooms both claims. Negligence requires a showing that the defendant breached some duty owed to the plaintiff, while silence cannot be a negligent *misrepresentation* absent a legal duty to speak. *See, e.g., Stitt ex rel. Stitt v. Raytown Sports Ass'n*, 961 S.W.2d 927, 930 (Mo.Ct.App.1998) (elements of negligence); *Steele v. Ellis*, 961 F.Supp. 1458, 1466 (D.Kan.1997) (applying Missouri law); *Weisblatt v. Minnesota Mut. Life Ins. Co.*, 4 F.Supp.2d 371, 380 (E.D.Pa. 1998).[12]

Apparently after exhaustive searching, the Bank's best case seems to be *B.L. Jet Sales, Inc. v. Alton Packaging Corp.*, 724 S.W.2d 669 (Mo.Ct.App.1987). In that case, the ultimate purchaser of an airplane sued a repair shop which, contrary to federal regulations and possible industry practice, failed to record certain repairs which would have alerted the purchaser to an earlier corrosion problem that reappeared. The court said that the repair shop allegedly "negligently failed to enter certain required information in the plane's log books, an omission which, if true, is tantamount to supplying false information." *Id.* at 672.

The "duty to speak" in that case was imposed by law, a federal regulation. No such duty to speak in this case is imposed by statute or any other source of law cited by the Bank. Furthermore, any record of repairs supplied, omitting the pertinent repairs, is "tantamount" to a representation that no other repairs were made—a form of misrepresentation concurrent with the representation made by the shop at the completion of its task. *Id.* In the present case, there is no allegation or other claim that Dr. Jallow supplied representations to the bondholders, and thus any omissions in the representations were not attributable to him as a form of misrepresentation.

The "whistle-blower duty" relied on by the Bank finds no support in Missouri law or in any other out-of-state caselaw on which the Bank relies. My own review of Missouri law convinces me that there is no such affirmative duty as between directors and outside creditors. *See, e.g., Darling & Co. v. Fry*, 24 S.W.2d 722, 723 (Mo.Ct.App. 1930) ("The rule in Missouri seems to be

---

**11.** The existence and scope of such a duty is a question of law. *See Stitt ex rel. Stitt v. Raytown Sports Ass'n*, 961 S.W.2d 927, 930 (Mo. Ct.App.1998). As such, Dr. Jallow's default did not waive the contention that no such duty exists.

**12.** The negligent misrepresentation claim is particularly troublesome. Such a claim is premised upon a theory that the speaker believed that a statement was correct, but was negligent in so believing. *See Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo.Ct.App.1994). The Bank's latest assertions, however, contend that Jallow knew of Midwestern's troubles prior to becoming a director, as a result of consulting work previously performed. Therefore, the Bank contends, Jallow may be liable for fraud even though the complaint charges him with negligence, since the pleader need not identify the correct legal theory. Yet, the Amended Complaint neither describes Jallow's pre-director activities nor provides any other notice of a contention that he knew about Midwestern's financial state prior to May 1983. Furthermore, a fraud claim, like a negligent misrepresentation claim, may rest upon a defendant's silence only if the defendant had a legal duty to speak. *See Independent Business Forms, Inc. v. A–M Graphics, Inc.*, 127 F.3d 698, 701 (8th Cir.1997); *Reeves v. Keesler*, 921 S.W.2d 16, 21 (Mo.Ct.App.1996). Relabeling the claims does not obviate the Bank's need to show that Dr. Jallow had a duty to speak, and that such a duty extended to Midwestern's creditors.

that in order to make an officer or agent of a corporation liable to a third person, something more must be shown than a mere act of nonfeasance on the part of the agent."); *Union Nat. Bank of Kansas City v. Hill,* 148 Mo. 380, 49 S.W. 1012, 1017 (1899) ("[F]or the mere failure of the bank directors to exercise ordinary diligence and care as such, in the management of the business affairs of the bank, by reason of which the bank became insolvent, they cannot be held responsible at the suit of its general creditors."); *Zipper v. Health Midwest,* 978 S.W.2d 398, 414 (Mo.Ct.App. 1998) ("[C]orporate officers may be held individually liable for tortious corporate conduct if they have actual or constructive knowledge of, and participated in, an actionable wrong."); *Omaha Indem. Co. v. Royal American Managers, Inc.,* 777 F.Supp. 1488, 1492 (W.D.Mo.1991) (same).[13] Whatever moral or ethical obligations may exist, and however commendable whistle-blower activity may be, it cannot be concluded that the Missouri courts would adopt it as a legal requirement, and would impose liability on directors who have adverse knowledge about a company and fail to go public with such information.[14]

It may be supposed that there might be an internal obligation to present adverse information, so that it could be inferred both that Dr. Jallow became aware of Midwestern's financial problems in mid–1983 and had a responsibility as director to present such information to the top corporate executives and/or the board of directors, or at least to resign from the board and thereby trigger the trustee's scrutiny of Midwestern's affairs.[15] If this is assumed, arguendo, Missouri apparently is in a minority of states where internal duties of directors do not spread to become duties to creditors. *See* 3A *Fletcher Cyclopedia of the Law of Private Corporations,* § 1181 ("Minority Rule"), at 427, and Missouri cases cited in n. 1. ("The minority rule is that creditors of corporations cannot, in general, maintain an action against directors for default in duty owed to the corporation, although the creditors may be injured as a result."). Thus, even if Dr. Jallow had a duty to disclose Midwestern's financial troubles or to resign under protest, these duties did not extend to Midwestern's outside creditors.

Based on the foregoing discussion, it is hereby ORDERED as follows:

13. Even if Dr. Jallow's potential liability as an officer might be broader than his liability as a director under certain facts lately asserted by the Bank, officer liability is not pleaded. The First Amended Complaint seeks relief against Dr. Jallow because of his conduct as a director of Midwestern beginning on May 25, 1983. *See* ¶ 14, p. 7. He is not otherwise specifically identified in the 118 page document. While not conceding that officer status is necessary to recovery, the Bank contends that Dr. Jallow served at least temporarily after May 25 as a financial official of Midwestern and that his failure to publicly expose financial problems was a cause of loss of the bond purchase money, which was not fully distributed for some substantial time after May 25.

In support of the claim that Dr. Jallow was indirectly referred to as an officer, the Bank cites ¶ 300, p. 102, where the Amended Complaint refers to defendants Card, Walker, Wright, Redd, Jallow and Palmer as "directors and/or officers." Fairly construed,

this refers to the officer status of certain of the co-defendants, but plainly not Dr. Jallow. The identification in ¶ 14 is by no means *supplemented* by the ¶ 300 reference.

14. Compare the view of Judge Leval that "the securities laws do not require every participant in the commercial market place to become a whistleblower." *Chase Manhattan Bank v. Fidata Corp.* 700 F.Supp. 1252, 1263 (S.D.N.Y.1988).

15. It may also be supposed, arguendo, that Dr. Jallow may have himself spread misinformation about the company's finances and prospects, in promotional activities listed by the Bank outside the pleadings. Thus, he conceivably had misrepresentation exposure to others who may have relied on his promotions 17 years ago, but this has nothing to do with the Bank or bondholders who had purchased revenue bonds some months before Dr. Jallow's promotional activities. Of course, these activities are absent from the Amended Complaint in any event.

1) Defendant Jallow's motion for summary judgment (Doc. 222) is GRANTED. The clerk is directed to enter judgment for defendant Jallow and against plaintiff. The court will retain jurisdiction for the limited purpose of determining an appropriate sanction against Dr. Jallow for falsely denying receipt of service.

2) Defendant Jallow's motion for relief from entry of default (Doc. 193), as renewed at argument in March, is DENIED as moot, in light of the favorable ruling on the merits.

3) Plaintiff's motion to limit causation evidence and enter judgment (Docs.208–1, 208–2) is DENIED.