IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 2, 2003 Session

## DAVID T. SEARS, ET AL. v. CHARLES GREGORY, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 01C-2936    Barbara N. Haynes, Judge**

_____

**No. M2002-02771-COA-R3-CV - Filed January 23, 2004**

_____

Plaintiff homeowners sued Defendant pest control operators for negligent misrepresentation and breach of warranty relative to the issuance by the Defendants of a wood destroying insect infestation inspection report pursuant to Tennessee Code Annotated section 62-21-201 to 206. The trial court granted summary judgment to Defendants. Because civil liability is limited by section 62-21-202 and Plaintiffs allege no damages caused by the presence of wood-destroying insects, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., joined. WILLIAM C. KOCH, JR., P.J., M.S., filed a dissenting opinion.

Lawrence H. Hart, Nashville, Tennessee, for the appellants, David T. Sears and wife, Anita G. Sears, David T. Sears as natural guardian and next friend of M.L.S., a minor and B.S., a minor.

M. Bradley Gilmore and Kathleen W. Smith, Nashville, Tennessee, for the appellees, Charles Gregory, d/b/a Charles Pest Control and Charles O'Brien, individually and severally, Western Surety Company.

**OPINION**

David T. Sears and Wife, Anita G. Sears, were first time home buyers in the market for a moderately priced home. Mrs. Margaret L. Jones owned such a home located at 3815 Marydale Court in Nashville. This home was located near to Mrs. Sears' place of employment and she observed a Crye-Leike Realtor "for sale" sign in the front yard. At the suggestion of their home loan originator, they contacted real estate agents Sandra Hill and Michelle Thatcher, d/b/a "The Buyer's Agent." The Sears signed a contract with the buyer's agent under which they would pay Hill and Thatcher 3% of the sale price of any home that they purchased. They looked at two or three other

properties with their agent but settled on the Marydale Court residence and made an offer of $79,900 for the property. This offer was rejected, but ultimately, Mrs. Jones accepted their offer of $83,000.

As it relates to termites and wood destroying insects, David Sears testified:

> Q. As you sit here today, do you have - - what is your first recollection of thinking about, hey, we need an inspection or we are going to get an inspection for termites or other wood-destroying insects?
> A. What would be my concerns?
> Q. What I am asking is when - - as you sit here today, when was the first time that you recall even thinking about that issue?
> A. At closing.
> Q. So prior to closing, you don't have any recollection of even discussing that issue with Ms. Hill or Ms. Thatcher or even thinking about it?
> A. No.
> Q. Did you and Ms. Hill or Ms. Thatcher or anybody from The Buyer's Agent ever talk about the fact that you should have a home inspection done?
> A. Yes.
> Q. Tell me about the discussions there.
> A. She talked us out of it.
> Q. Did you bring it up or did she bring it up?
> A. She brought up if we wanted a home inspection.
> And I said, Yes. And I said how much would it cost.
> And she said $400.
> And I said we don't have $400.
> And she said you don't really need it. All they are going to do is check out your plugs and stuff.
> Q. By who?
> A. Ms. Hill.

Plaintiffs made no inspections themselves in the crawl space or by testing the floor boards or probing the walls prior to the closing on March 9, 2001.

The inspection by the Defendants, who provided to the buyers on behalf of the sellers the wood destroying infestation inspection report in issue in this case, occurred on February 22, 2001. Neither of the Plaintiffs ever had any contact with Defendants, Charles O'Brien or Charles Gregory, until well after the date of closing and after they had discovered moisture and mold problems with the house.

The facts up to this point of the chronology are essentially undisputed. Indeed, there is little material dispute as to the facts of the case. However, the facts subsequent to the closing on March 9, 2001 reveal something of a nightmare to Plaintiffs. As this case is before the Court on summary

judgment, the recitation of the facts is subject to the caveat that the facts are found and considered by the Court in the light most favorable to Plaintiffs. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993).

Within days after moving into the home, Plaintiffs began to experience nasal irritation and severe headaches. These symptoms were accompanied by a burning sensation in the eyes and disagreeable odors. Plaintiffs first removed their newly installed carpet from their bedroom on the assumption that it was a causal factor of their symptoms. They then called Home Depot, who suggested the installation of a plastic vapor barrier in the crawl space under the house. When this did not alleviate the problem, they called Steamatic of Nashville for an evaluation of their house. Next, they called Terminex and, following Terminex' inspection, installed new ventilators and applied timbor, a chemical designed to control excessive moisture.

The basic problem is probably best explained in the report of J. Scott Warrington, senior inspector for Inspection Services by Scott. Said Mr. Warrington:

> **Conclusions And Recommendations**: Mold spores are present everywhere except where special "clean room" conditions are maintained. Therefore the mere presence of mold does not mean there is a problem. However, where there is a food source and sufficient moisture the colonies will grow and multiply producing a reservoir of spores. This increased activity can pose a health threat depending on the individuals exposed and the type of mold. This results from exposure to mycotoxins. These are a byproduct of growth and are toxic to humans.

> The pattern of moisture in the walls (more dampness near the floor) indicates the moisture is coming from below and wicking into the absorbent material of the drywall. First priority should be given to ensuring that the source of moisture is eliminated. The installation of ventilation equipment and a moisture barrier should be of considerable help in this situation. Treating the effected areas with a sanitizer/mildewcide such as sodium hypochlorite solution is suggested. A supply of dehumidified air to the crawl space would also be helpful.

> Commercial dehumidifiers should be used to assist in drying the walls. Baseboards can be removed and holes drilled that allow access to the wall cavity. Using negative pressure, damp air can be sucked out of the wall cavity and replaced with drier air. When the walls are dried to normal level of moisture content and the humidity is maintained below 50% reservoirs of mold growth will no longer be a problem. This drying should be able to be accomplished in approximately 2 days. After drying, the baseboards are replaced covering the holes.

> Air removed from the walls should enter a HEPA filter to remove any spores and mycotoxins from the air. Simply exhausting the air into the home can spread the mold spores.

For added assurance, a mildewcide can be applied to the inside of the wall cavity using a sprayer with a nozzle extension that fits through the holes at the base of the wall. These openings can also be used with a fiber optic inspection tool to examine the inside of the wall cavity for mold.

Charles Pest Control is an individual proprietorship owned by Defendant Charles Gregory. At the time of the February 22, 2001 inspection at 3815 Marydale Court in Nashville, Charles O'Brien was an employee of Charles Gregory and was in the process of buying the business from Mr. Gregory. Charles Pest Control was contacted by agents of the seller for the purpose of providing to the buyers a wood-destroying insect infestation inspection report. Charles O'Brien inspected the property on February 22, 2001, after which he prepared and signed the report.[1] The report states that the inspector found "**No Visible** evidence of a wood destroying insect infestation."(emphasis in original). The report further made exception as to inaccessible areas, same being insulation in the crawl space, fixed ceilings, fixed wall covering, floor covering, and cabinets or shelving. Mr. O'Brien made no notation of any kind on the report about moisture in the crawl space or wide spread mold, although in deposition he acknowledged that at the time of his inspection, 80% of the crawl space was affected by mold.

The only defendants in this case are the two men who operated Charles Pest Control. Their liability for either negligent misrepresentation or breach of warranty depends entirely upon the wood-destroying insect infestation inspection report of February 22, 2001. This particular report is on a form prescribed by the National Pest Management Association and the United States Department of Housing and Urban Development.

In granting summary judgment to Defendants, the trial court held:

> As grounds for its decision, this Court finds that the gravamen of the plaintiffs' claims are negligent misrepresentation under § 552 of the Restatement (Second) of Torts, as that section has been adopted in Tennessee, and breach of warranty as set forth in subsection (c) of Tenn. Code Ann. § 62-21-202. To be successful, both claims require the plaintiffs to have detrimentally relied on a misrepresentation or false statement made by the defendants, or on a warranty that has been breached. The undisputed facts of this case show, however, that the defendants did not make any false statement or misrepresentation upon which the plaintiffs relied to their detriment in the Wood Destroying Insect Infestation Report given to the plaintiffs by defendant Charles O'Brien, nor did the defendants breach the warranty created by the statute cited above. The defendants are, therefore, entitled to judgment as a matter of law.

---

[1] This specific report is the subject of Tennessee Code Annotated section 62-21-201 to 206 wherein its purpose, contents and effect are specifically set forth.

This particular HUD form had been in existence long prior to Chapter 668 of the Public Acts of 2000, effective July 1, 2000. However, the 2000 Act of the legislature was enacted in response to the decisions of this Court in *Fuller v. Feingold*, No. 02A01-9809-CV-00252, 1999 WL 250182 (Tenn.Ct.App.April 28, 1999), and *Walker v. Arrow Exterminators, Inc.*, No. 01A01-9809-CV-00492, 1999 WL 722639 (Tenn.Ct.App.Sept. 17, 1999).[2] Both of these cases involved actual termite infestations and resulted in judgments for the defendants on a basis that the plaintiffs could not prove that the wood-destroying insect infestation was present at the time the report was issued, rather than first appearing at some time subsequent thereto.

Chapter 668 of the Acts of 2000 amended Tennessee Code Annotated section 62-21-102 to add a new definition, same being:

"Wood destroying insect infestation inspection report" means a report written by a chartered commercial pest control operator employing a person licensed in the category of wood destroying organisms. The report shall indicate the presence or absence of visible wood destroying insects and the presence or absence of visible damage caused by such insects and shall be issued after an on-site inspection of the property.

The Act also provided for a new Part to the Code entitled "Wood Destroying Insect Infestation Inspection Reports" and now codified as section 62-21-201 to 206. In pertinent part, this section provides as follows:

**62-21-201.** **Persons authorized to issue reports – Persons authorized to conduct inspections.** – Wood destroying insect infestation inspection reports, as defined in this chapter, issued in conjunction with the sale or transfer of any real property shall only be issued by a chartered pest control operator licensed, or employing personnel licensed, in the category of wood destroying organisms. Only those persons licensed in the category of wood destroying organisms or certified in the category of industrial, institutional, structural and health related pest control working under the direct supervision of one licensed in the category of wood destroying organisms are authorized to conduct inspections for wood destroying insect infestation reports.

**62-21-202.** **Contents of report – Warranty – Civil liability**. – (a) A wood destroying insect infestation inspection report issued by a chartered pest control operator evidences the presence or absence of visible wood destroying insects and the presence or absence of visible damage caused by such insects noted on the day the

---

[2] This history and origin of Chapter 668 of the Public Acts of 2000 was determined from Representative Odom's remarks to the House Commerce Committee on March 7, 2000 and to the House Session on April 13, 2000. The bill was sponsored by Representative Odom in the House and Senator Henry in the Senate.

inspection is made. Obstructions and inaccessible areas shall be so noted in the report.

      (b)    The wood destroying insect infestation inspection report shall be submitted on forms prescribed by the National Pest Management Association and the department of housing and urban development. In addition to other information, the report shall include the address of the property, a graph or other diagram showing the layout of the property, the areas of damage or active infestation (if any), the name of the licensed or certified employee conducting the inspection, the pest control operator name, address and charter number, the date of the inspection and any recommendations for corrective action.

      (c)    Notwithstanding any provision of law to the contrary, a wood destroying insect infestation inspection report is a warranty for ninety (90) days of the accuracy of any representations in such inspection report.

      (d)    The person to whom a wood destroying insect infestation inspection report is issued may recover from the warrantor for breach of warranty compensatory damages, including all repair costs which are proximately related to the warranty as provided in § 62-21-203.

      (e)    Any person knowingly issuing a false report or who issues a report without making a physical inspection of the site shall be liable in treble the amount of damages resulting from or incident to the breach of the warranty. The party injured by such breach may bring suit for the breach and for such damages.

      **62-21-203.**    **Remedies**. – Disputes which cannot be resolved between property owners, lenders, and/or trustees and persons issuing a wood destroying insect infestation inspection report may be resolved in a court of appropriate jurisdiction. Prior to filing a suit for compensatory damages, the issuer of the report shall be given an opportunity to inspect the premises and to offer within thirty (30) days of such inspection a proposal for repair and treatment of the premises. Notwithstanding any other provision of law or rule to the contrary, if the property owner files suit prior to offering the issuer of the report an opportunity to inspect and propose repairs and treatments as required by this section, the issuer of the report shall have, in addition to the thirty (30) days in which to answer the complaint as provided in Rule 12 of the Tennessee Rules of Civil Procedure, another thirty (30) days from the service of the summons and complaint within which to inspect and propose repairs and treatments before being required to answer the complaint. No property owner or lender shall be required to engage in an alternate dispute resolution process before filing a suit for compensatory damages.

Tenn. Code Ann. §§ 620-21-201 to 203 (Supp.2001).

The effect of Chapter 668 of the Public Acts of 2000 is to prevent results similar to *Fuller* and *Walker* by casting upon the licensed pest control operator the burden of any wood destroying insect infestation that might occur within ninety days of his report.[3]

The difficulty for Plaintiffs in this case is that there is not now, and never has been, a wood destroying insect infestation which is proximately related to the damages they seek to recover from Defendants.[4]

The expert witness affidavits offered by Appellants seek to establish a standard of care far more extensive than the limitations set forth in Tennessee Code Annotated section 62-21-201 to 206. The affidavit of Philip Hurst, pesticide inspector for the Tennessee Department of Agriculture, asserts in pertinent part:

> **B.   REPORT SECTION IV & IX** - Mr. O'Brien made no additional comments in Section IV of the report.  My inspection of the structure revealed that in the crawl space there was obvious visible evidence of conducive conditions to wood destroying insects which was excessive moisture and insufficient ventilation. In addition, the structure had a faulty grade which contributed to the excessive moisture in the crawl space.  The excessive moisture was immediately obvious because of the clearly visible fungus and extensive mold that had developed on a substantial number of the wooden rafters in the crawl space.
>
> While Section IX contains a consumer maintenance advisory for prevention of wood destroying insects, the advice given to consumers regarding factors which may lead to infestation for wood destroying insects also reflects the standard of care, or industry standards, that are part of the inspection and report of a residence.  This is because the standard of care for pest control operators, or industry standards, require not only that wood destroying insect infestation inspection and report note the presence of visible evidence of inset infestation, but also conditions that are conducive to insect infestation.
>
> The report in Section II states that the report is "indicative of the condition of the subject property."  A pest control operator or technician is trained not only to detect infestation, but also to detect conditions that are conducive to infestation. Detecting conducive conditions allows steps to be taken to prevent insect infestation before it occurs which prevents the damage to structures that results from insect infestation.  Like a dentist whose professional practice does not just include the treatment of cavities, but also the prevention of cavities; a pest control operator's

---

[3] How this warranty can be applied in actual practice is difficult to imagine, as the expert proof in both *Walker* and *Fuller* establish the potential for rapid growth of termites in the spring and that termites can enter a home over night.

[4] The evidence discloses a previous termite infestation, together with an infestation of carpenter bees, but there is no allegation that these wood-destroying insect infestations caused any of the damages resulting to Plaintiffs.  All of the damages are alleged to result from extensive fungus mold infestation brought about by excessive moisture.

professional practice does not just include the treatment of insect infestation but also the prevention of insect infestation.

The most important conducive condition is moisture since insects cannot exist, or infest, without moisture. Moisture is a prerequisite to insect infestation. In other words, there will not be any insect infestation if there is no moisture, however if there is high or excessive moisture, there is a high probability that insect infestation will occur.

Accordingly, an inspection of the condition of a structure must include detecting conducive conditions for insect infestation that exist in the structure relating to moisture such as faulty grade, the presence of excessive moisture, and insufficient ventilation.

The affidavits of expert witness Mike Lefever and the expert witness Tim Green assert the same standard of care relative to moisture as a condition which invites insect infestation. However, such a standard of care simply cannot be imposed in the face of a statutory limitation that "[a] wood-destroying insect infestation inspection report issued by a chartered pest control operator evidences the presence or absence of visible wood destroying insects and the presence or absence of visible damage caused by such insects noted on the day the inspection is made." Tenn. Code Ann. § 62-21-202(a)(Supp.2001). All of the damage complained of by Plaintiffs is caused, not by wood destroying insects, but by the effects of excessive moisture. If the obvious excessive moisture conditions observed not only by Plaintiffs' experts, but by Charles O'Brien himself, had led to a massive infestation of wood destroying insects, summary judgment would certainly have been improper. If the previous termite infestation observed by the experts or the carpenter bees observed by the experts were causative of the damages asserted by Plaintiffs, summary judgment would, likewise, have been improper.

However, the statutorily limited scope of a wood destroying insect infestation inspection report simply cannot form the predicate to extend liability for the effects of excessive moisture completely divorced from wood destroying insects. The warranty created by Tennessee Code Annotated section 62-21-202 is not available to Plaintiffs except under the limited conditions set forth in that same statute. No misrepresentation of fact has been made within the limited scope of statutory requirement in the wood-destroying insect infestation inspection report.

Assuming, but not deciding, that Chapter 668 of the Public Acts of 2000 as codified in Tennessee Code Annotated sections 62-21-102 to 206 does not displace common law remedies as to the wood-destroying insect infestation inspection report, *see Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 899 (Tenn.1992), a negligent misrepresentation case cannot be predicated upon any affirmative misrepresentations of fact made in the February 22, 2001 report. Such case could only be made upon the basis of a failure to disclose information relative to moisture conditions.

Our courts have pointed out consistently that liability for nondisclosure can arise only in the cases where the person being held responsible had a duty to disclose the facts at issue. The Tennessee Supreme court has held:

In all cases, concealment or failure to disclose, becomes fraudulent only when it is the duty of a party having knowledge of the facts to discover them to the other party: 2 Pom. Eq., sec. 902. And this author, in the same section says: "All the instances in which the duty to disclose exists and in which a concealment is therefore fraudulent, may be reduced to three distinct classes:

1. Where there is a previous definite fiduciary relation between the parties.

2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other.

3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. The contract of insurance is an example of this last class."

*Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418, 424-25 (1885). See also *Simmons v. Evans*, 185 Tenn. 282, 285, 206 S.W.2d 295, 296 (1947); *Dozier v. Hawthorne Development Co.*, 37 Tenn. App. 279, 292-93, 262 S.W.2d 705, 711 (1953); *Macon County Livestock Mkt. v. Kentucky State Bank*, 724 S.W.2d 343, 349 (Tenn.Ct.App.1986); *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003).

The facts of this case disclose no fiduciary relationship between the parties. Plaintiffs had never heard of Defendants prior to the March 9, 2001 closing on the house. There is no evidence that Plaintiffs expressly reposed a trust or confidence in Defendants, and the contract is not intrinsically fiduciary.[5]

Taking our analysis one step further, as was done in *Justice v. Anderson Co.*, 955 S.W.2d 613 (Tenn.Ct.App.1997), the mold and moisture conditions under the house were reasonably known or discoverable by Plaintiffs. They did not look under the house prior to closing and expressly rejected a home inspection prior to closing.

It is difficult to stymie first time homeowners when their dreams turn to nightmares, but practical considerations mandate such results. The former owners of the property are not defendants. Plaintiffs had the opportunity to have a home inspection made and were dissuaded from such action,

---

[5] Charles Gregory and Charles O'Brien are not parties to the contract of sale, and their liability can only arise from the alleged deficiencies in the wood-destroying insect infestation report. While *Patel v. Bayliff*, No. W2002-00238-COA-R3-Cv; 2003 WL 1193248 (Tenn.Ct.App.2003)(app.denied Oct. 6, 2003) avoided Restatement (Second) of Torts Section 551(1) requirements for negligent misrepresentation liability as same was adopted by *Macon County Livestock,* by applying *Simmons v. Evans*, the Restatement Section 551(1) requirements were apparently never raised in *Patel* as to the termite inspector. Summary judgment was granted in the trial court solely on the basis of lack of justifiable reliance on the termite letter. This case was reversed on appeal on the sole basis of a material issue of fact relative to reliance. As to the termite inspector, the Court of Appeals does not discuss the requirements of Restatement Section 551(1). In any event, *Patel* involved failure to disclose termite infestations, past and present, with resulting damages from such infestations. In the case at bar, the undisclosed conducive conditions did not conduce.

not by these defendants, but by their own real estate agents. Plaintiffs did not purchase a pest control contract from these Defendants or any other pest control operator but relied, alone, on a statutory inspection report, the scope of which is drastically limited by the statute.

The judgment of the trial court is in all respects affirmed, and costs are assessed to Appellants.

_____
WILLIAM B. CAIN, JUDGE